UNITED STATES, Appellee

v

JERRY W. TURNER, Private First Class, U. S. Army, Appellant

7 USCMA 38, 21 CMR 164

No. 6737

Decided May 4, 1956

*William F. Walsh, Esq.*, argued the cause for Appellant, Accused. With him on the brief were *Colonel J. M. Pitzer, Colonel Burton F. Ellis, Lieutenant Colonel James M. Scott, Lieutenant Colonel Harley A. Lanning,* and *First Lieutenant James L. Gault.*

*First Lieutenant Peter J. Hughes* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *Lieutenant Colonel Robert M. Murray.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Charged with robbery committed in conjunction with Corporal Joe Hill and Private Henry Valenzuela, the accused was tried with Valenzuela and found guilty. He was sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for two years. After intermediate appellate authorities affirmed the conviction, he filed a petition for grant of review in this Court. Before we acted on this petition, he also filed a petition for new trial. We granted the petition for grant of review on the single issue of whether the accused was prejudiced by the post-trial review of his case, and we ordered briefs and oral argument on the petition for new trial on the question of whether the testimony of Hill, who appeared as a prosecution witness, constituted a fraud on the trial court. Hill had been tried previously for the same robbery and had been convicted.

The accused, accompanied by Valenzuela and Hill, Mrs. Patsy Titus, Mrs. Peggy Hendricks Austria, and Mrs. Hill, set out on an automobile trip. The group was paired off, with Mrs. Hill as Valenzuela's companion. According to Hill, Mrs. Titus had suggested earlier that morning that they finance the trip by "rolling" hitchhikers. The accused had approved of the suggestion by saying, "It's all right with me." Similar approbation was given by Valenzuela. Hill was the driver, Mrs. Titus sat next to him on the front seat, and the others were in the back. They left Fort Campbell, Kentucky, for Memphis, Tennessee. Outside of Paris, Tennessee, they picked up Private Skinner who was hitchhiking. Skinner agreed to pay two dollars for the ride to Memphis. He sat in the front seat. Shortly thereafter, Hill stopped at a roadside dairy bar. Everyone except Skinner got out of the car.

Hill testified that at the dairy bar, he, Valenzuela and the accused agreed to rob Skinner. He made "some arrangements" with Valenzuela to hand him the knife from the carving set that was in the back of the car. They returned to the car. Hill resumed his place as driver but Mrs. Titus got into the back. The accused took her place in the front. He sat next to the door so as to place Skinner between himself and Hill. After riding for a time, Hill signaled for the knife and it was passed to him from the rear. Hill then asked Skinner if he had any money. Skinner replied that he had ten dollars. Hill asked for a loan, but Skinner informed him that he had no money to lend. Thereupon, Hill said, "Let's have it. We're taking your money." At Hill's direction, Skinner passed a ten dollar bill, which he took out of his wallet, to Turner. Hill demanded Skinner's billfold. This, too, was passed to Turner. Turner examined the wallet and found $25.00 in it. According to Skinner, when the accused found the additional money he remarked that Skinner had lied to them. At the trial, Turner testified that he merely said "Huh," and a male voice asked, "What's the matter, Turner? Is he lying to you?" In a pretrial statement he attributed the voice to Valenzuela but at the trial he said it was Hill who asked the question. The accused told Skinner, "We're going to leave you five dollars to get back to camp on" and he returned the wallet to him with $5.00 inside. Hill stopped the car and ordered Skinner out. The accused got out to let Skinner out. The accused reentered the car and Hill drove off. A short time later, Skinner reported the matter to the local police. They apprehended the

40

accused and the others at a restaurant in Brownsville, Tennessee.

Both the appointed defense counsel for the accused and individual civilian counsel for Valenzuela cross-examined Hill at length. He admitted that "all of my testimony at my own trial was lies." He also admitted that "some" of his sworn pretrial statement to a Criminal Investigation Detachment agent was false. He attributed these falsehoods to the fact that he had been trying to defend himself. Hill insisted that he was "telling the truth" in his present testimony. He made the following denials: (1) that he had been promised a reduction in his sentence in return for his testimony; (2) that he had been promised that he would not be prosecuted for perjury; and (3) that he wanted the others "to go down the same road" with him. He said that his only reason for testifying "in this court is to tell the truth about this whole thing." He maintained that his father is a minister; consequently, he wanted "to see the whole thing come out even" so that he could "straighten up" for his father. Hill's previous false statements were commented upon by the prosecution and both defense counsel in their respective arguments. In his final instructions, the law officer advised the court that it must consider the testimony of an accomplice with "great caution."

After the board of review affirmed the accused's conviction, Hill submitted a sworn statement. This statement provides the major basis for the accused's petition for new trial. In it, Hill maintains that he lied at the accused's trial. He says that before he testified, he was called to the office of Lieutenant Colonel Ryan, the Staff Judge Advocate of the post. Purportedly, Colonel Ryan went over the testimony at Hill's trial and pointed out 43 lies by Hill, 27 of which he "would need to convict Turner and Valenzuela." Colonel Ryan allegedly told him that he did not have enough evidence to convict the accused and Valenzuela without his testimony, and if he made a statement, his time "would be cut half or more." Hill now contends that he testified falsely at the accused's trial because of "this agreement" and the fact "that Valenzuela was running about with my wife." He further contends that contrary to his testimony at the trial, Turner objected to his proposal to rob Skinner. He thereupon said to the accused, "you wouldn't want to find yourself out here on the road with your head split open." Turner started to get into the back of the car, but he ordered him to sit in the front beside Skinner. At that time he said, "I had Turner under my control."

In a lengthy sworn statement submitted in opposition to the petition for new trial, Colonel Ryan reviews his activities in this case. On the incessant importuning of Mr. and Mrs. Turner, the accused's parents, who feared the severe penalty for armed robbery under Tennessee law, he succeeded in obtaining the release of the accused and the others by the civilian authorities and the dismissal of the civilian proceedings against them. Colonel Ryan says that he was sought out by Hill after Hill had been convicted of robbery in his separate trial (see 6 USCMA 599, 20 CMR 315). Hill admitted that he had lied at his own trial, and insisted that he now wanted to tell the truth because of his "conscience." Still concerned about Hill's truthfulness, Colonel Ryan asked him if he would submit to a lie detector test. Hill agreed. During the test examination, Hill gave the examiner, Chief Warrant Officer Robert I. Davis, an oral account of the robbery. Parenthetically, we note that this account substantially coincides with Hill's testimony at the accused's trial. In addition, the results of the test indicated that Hill's account of the incident was true. The accused also agreed to submit to a lie detector test. The test results indicated that he was lying. On the basis of these tests, Colonel Ryan had Hill see Captain Carney, the trial counsel, to arrange for his testimony at this trial. Captain Carney substantially corroborates Colonel Ryan's account of this meeting. The substance of his statement is as follows:

"2. Some days thereafter I had one of the men in the office go to the CID and obtain the polygraph examination results, together with a state-

**41**

ment made by Hill to the CID at the time for the examination. Upon receiving those documents and finding that his statement was apparently truthful I interrogated him with a view toward fitting his testimony into my trial brief. As I recall, in Hill's trial one of the prosecution witnesses testified that the group had planned to go to California. I asked Hill about that matter, and he stated that they had so planned. I also asked Hill to narrate to me the sequence of events of the day upon when the offense took place and at that time he gave me generally the same testimony he presented to the court in the Turner—Valenzuela trial. . . .

"7. At no time did Hill tell me that he did not know to what he was going to testify. Upon my first interrogation of him after the polygraph examination he told me as full and complete a story as he subsequently told the court. At no time did I suggest any line of testimony to Hill. I merely heard his story and by questioning him brought out the details thereof."

The crux of the question presented by the petition for new trial is whether Hill is now telling the truth. ▌ He maintains that he threatened to split open the accused's head and leave him on the road if he did not join in the robbery. In assessing the probable truth of this contention, it is appropriate to look at the accused's own testimony at the trial. In his direct examination, on cross-examination, and on examination by the court, the accused testified as follows:

"Q: Now, why did you take the $10.00 when Hill told Skinner to give it to you?
A: Sir, I didn't know anything else to do, Skinner just turned around and handed me the money.

. . . . .

Q: Now, Turner, did you in any way intend to rob this kid?
A: No sir, I had no intentions of robbing this boy.

Q: But, you knew it was wrong to take his money.
A: Yes sir.
Q: What did you intend to do?
A: I didn't know what to do when Hill told me to take the boy's money, Hill kept talking and talking loud and I just took it.

. . . . .

Q: Now, if you knew that it was wrong to take Skinner's money why did you take it?
A: I didn't know what to do.
Q: What do you mean, you didn't know what to do?
A: I'd never been mixed up in anything like that in my life.
Q: Well, if you knew it was wrong why didn't you refuse to take it?
A: Hill just told me to, that's all.
Q: Are you afraid of Hill?
A: He's a pretty forcefull man sir.
Q: Were you afraid of him on the night of 10 September?
A: The way he was acting I was sir.
Q: What were you afraid of?
A: What he was doing.
Q: He wasn't doing anything to you was he?
A: Well, he wasn't doing me any physical harm.

. . . . .

Q: Pvt Turner, you stated that you had some fear of Hill, that you were afraid of him. Is that the reason that you accepted the money from Skinner when Hill said, 'Give it to Turner'. Did you accept that money because you were afraid of Hill?
A: Well sir, I didn't know what to do.
Q: Were you afraid of what Hill might do to you if you did not accept this money?
A: Well sir, it came into my mind that he had threatened to kill Valenzuela and I just didn't know what to do.
Q: Why did it occur to give Skinner $5.00 when you gave him his billfold? Did you not have fear of Hill at that time or were you afraid of Hill to the point that Hill might commit some violence to you?
A: I was taking that chance sir.

Q: Well, why didn't you take a chance and give all the money back?

A: I just figured I might as well give him the five dollars.

. . . . .

Q: Why did you accompany him on the trip if you were afraid of him?

A: He didn't show any outward appearance toward me sir.

Q: Did your fear increase as the trip went on?

A: It increased a great deal when he started to ask the boy for his money. And then when he told me what he was going to do.

Q: And did it increase to the point to where you would do anything he told you?

A: I would think twice before I would do something he didn't want me to do.

. . . . .

Q: Now Hill had never threatened you prior to this incident had he Turner?

A: No sir, he hadn't.

Q: He never made any motion or indicated to you that he was going to hurt you in any way?

A: No sir.

Q: For what reason then did you have to be afraid of Hill?

A: The way he . . .

DEFENSE COUNSEL: I'm going to object to that. I realize that the trial counsel has a great latitude but that same question has been proposed at least a dozen times during the last thirty minutes and has been answered the same way every time.

LAW OFFICER: I believe at this time I will sustain the objection.

TRIAL COUNSEL: All right.

. . . . .

Q: Now, in your statement to agent Thompson of the CID, did you say anything to him about being afraid of Hill?

A: No sir, I didn't.

Q: And you testified in Hill's trial did you not?

A: I did sir.

Q: Did you say anything at that time about being afraid of Hill?

A: I just answered the questions that were asked me."

These excerpts from the record make it apparent that the accused had a substantial number of opportunities to tell the court that he had been threatened. But he did not do so. Instead, he ascribed his fear of Hill to Hill's threat to "do something" to Valenzuela because Valenzuela was going with Mrs. Hill. Yet the uncontradicted and unrepudiated testimony of every witness questioned about the relationship between Mrs. Hill and Valenzuela shows that Hill was not concerned. It was undisputed at the trial and it is undisputed now that Mrs. Hill was Valenzuela's companion on the trip and that Hill was paired with Mrs. Titus. At the trial, Hill testified that he was indifferent to the relationship between Mrs. Hill and Valenzuela because "I've never stayed with my wife whatsoever. Even since May 29th, 1954 I had an average of two weeks with my wife because she's been running out of here back and forth." He has not repudiated this testimony. According to Mrs. Titus, Hill "acted like he didn't mind" the association between Mrs. Hill and Valenzuela. Mrs. Hill, testifying as a defense witness, said that the men appeared to be "very friendly" and there was "no animosity" between Hill and Valenzuela. The accused himself testified that Hill and Valenzuela "had made friends" and that the three of them had breakfast at Mrs. Titus' on the morning of the trip. On the basis of the accused's own testimony and other undisputed evidence, we conclude that the present claim that Hill coerced the accused into joining in the robbery is false. We also conclude that Hill's contention that he lied at the trial because Valenzuela "was running about" with Mrs. Hill is likewise false.

Presently, Hill maintains that when he suggested to the accused that they rob Skinner, the accused "didn't say anything and walked away." At the trial, however, the accused himself testified that when he heard Hill's proposal, he said, "Hold on a minute." He then went to talk to Valenzuela about the suggestion. According to his testimony, Valenzuela refused. Consequently, he told Hill that they "wouldn't go along with his idea." Nevertheless, the

**43**

accused did not resume his seat in the back of the car. Instead, he moved to the front seat and sat at the door so as to put Skinner between himself and Hill. In his present statement, Hill says that he ordered the accused to sit in the front. Again that does not conform to the accused's own testimony. At the trial, the accused did not mention any order. He attempted to explain the change by saying that Mrs. Titus was "under the impression" that they were going to rob Skinner, and had therefore moved into the back. His testimony is as follows:

"Q: What was the discussion you and Joe had?

A: Joe Hill told me he wanted to take the boy's money and asked me if I would agree to it.

Q: What did you tell him?

A: I told him to hold on a minute.

Q: What did you do then?

A: Then I proceeded to go where Valenzuela was, in the restroom. I met Henry Valenzuela when he was coming out of the rest room and I told him what Hill had told me. He told me that Hill was crazy and I agree with him. We decided that we would tell Hill that we wouldn't have anything to do with it. So we went back to the car and everybody was inside the car. So, Valenzuela went to the back of the car and I went to the side of the car and called Joe Hill out of the car, and we walked around to the back. I told Hill that we wouldn't go along with his idea. Then Valenzuela told him the same thing. So, we got back into the car.

Q: Now how were you seated when you got back into the car?

A: Patsy Titus was under the impression that Joe Hill and myself and Valenzuela were going to take the boy's money. She got into the back seat under that impression.

Q: Why was she under this impression?

A: Because she was standing outside the car when Joe Hill told me that he was going to take the boy's money and asked me if I agreed with him.

Q: Where did you sit?

A: When I got back into the car I sat on the right hand of the front seat.

Q: How come you didn't get in the back seat?

A: Because Patsy had already taken my place in the back seat. It was only a short ways to Memphis so I thought it didn't matter."

Again, therefore, Hill's latest contentions are substantially at variance with the accused's own testimony. On the other hand, Hill's trial testimony in this connection virtually coincides with that of the accused and is consistent with the other evidence. Thus, he testified that, "I told Patsy Titus to get in the rear of the car and Jerry he got in the front and we had already planned to take this boy's money." Mrs. Austria, who testified as a defense witness, stated that just before Hill awakened Skinner, Valenzuela told Mrs. Hill, "*they* were going to rob him, you know, get his money." In the light of these circumstances, Hill's present account of the accused's reaction to his proposal to rob Skinner is unworthy of belief.

In his latest statement, Hill contends that he told Skinner to give his wallet to the accused, "and he had $25.00 more and he said get it." Hill does not explain how he knew that there was more money in the wallet. At the trial, Skinner testified that when Turner looked into his wallet, he remarked that Skinner had lied. Although the accused denied making this remark, in a sworn pretrial statement he said that when he saw the money he laughed. At the trial he attempted to qualify this statement by claiming that he made an "impartial" comment. The court-martial was free to disregard the accused's trial testimony and to accept Skinner's as the true version of what transpired. Hill's present statement does not affect this finding.

Finally, Hill contends that he lied at the accused's trial because of his agreement with Colonel Ryan. Colonel Ryan unqualifiedly denies that he had any understanding whatsoever with Hill to the effect that Hill should perjure himself in order to convict the accused and Valenzuela. Without reviewing all the evidence, we note that in every instance

in which the meeting between Hill and Colonel Ryan extended to a third person, that person corroborates Colonel Ryan and discredits Hill. One important circumstance merits special mention. Hill now alleges that after he had taken the polygraph test at Colonel Ryan's request, and which incidentally he maintains that he "beat," he still did not know which story he was going to tell the court. It was not until after he had told Valenzuela and the accused that he was going to testify against him, and they persistently refused to speak to him, that he "made up the story that . . . [he] used." However, the statements by Captain Carney and Chief Warrant Officer Davis show that long before the trial Hill gave them a version of the robbery which substantially corresponds to his testimony at the accused's trial. Once more we conclude that Hill is lying and in view of this conclusion, we deny the petition for new trial. See Harrison v United States, 191 F2d 874 (CA 5th Cir) (1951).

Turning to the post-trial review, it appears that after the accused was convicted, Major H. H. Bookout reviewed the record of trial as Assistant Staff Judge Advocate. The review was approved by Colonel Ryan as Staff Judge Advocate. Major Bookout had previously served as law officer at Hill's trial. Consequently, his participation in the review of the record of trial of this accused was error. United States v Hill, 6 USCMA 599, 20 CMR 315. Later Colonel Ryan determined to review the record "without the benefit of Major Bookout's review." He made this decision because of the "terrific pressures" that were being brought to bear by the accused's parents and persons interceding on their behalf.

Instead of curing the error in Major Bookout's review, Colonel Ryan's action compounded it. The unusually close connection he had with the case after it had been referred for trial, not the least of which was his personal participation in the lie detector test taken by Hill and the accused, and his personal determination that Hill was telling the truth and the accused was lying, made it improper for him to act on the review. In view of this error, the decision of the board of review and the action taken by the convening authority are set aside.

The record of trial is returned to The Judge Advocate General for reference to a general court-martial authority other than that which acted upon the initial review. In accordance with Article 61, Uniform Code of Military Justice, 50 USC § 648, a new review will be made by a Staff Judge Advocate who has had no previous connection with the case and a new action will be taken by such general court-martial authority.

Judge LATIMER concurs.

Judge FERGUSON did not participate in the decision in this case.