UNITED STATES, Appellant

v

ORVILLE W. JUDD, Airman Second Class,
U. S. Air Force, Appellee

10 USCMA 113, 27 CMR 187

No. 11,901

Decided January 9, 1959

*Captain John W. Fahrney* argued the cause for Appellant, United States. With him on the brief were *Lieutenant Colonel Robert W. Michels, Lieutenant Colonel John F. Hannigan,* and *Major Carl Goldschlager.*

*Guy Emery, Esquire,* argued the cause for Appellee, Accused. With him on the brief was *Captain Norman J. Nelson.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was convicted of murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. He was sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined at hard labor for twenty-five years. The convening authority approved the findings and sentence, and the record was forwarded to a board of review in the office of The Judge Advocate General of the Air Force for necessary appellate action. The board set aside accused's conviction of murder and affirmed a finding of involuntary manslaughter. It then reassessed the sentence in the light of its action and determined that a dishonorable discharge, total forfeitures, and confine-

114

ment at hard labor for three years was appropriate punishment.

The Acting The Judge Advocate General of the Air Force certified the record to this Court, requesting answers to two converse questions which in essence ask us to determine the legality and correctness of the action taken by the board.

In order to put the issue in proper perspective, it is necessary that we state the evidence. In its opinion, the board of review recited the facts which were used to support its finding and we believe it will clarify our views if we republish the evidentiary portion of the board's opinion. Accordingly, the following part of the decision is quoted:

"Ruth Ann Judd was shot and killed on 26 July 1957. Her accused husband and their infant son were the only others present at the scene, the family trailer home at the time. A spent metal 'slug' was recovered from the victim's clothing. The bullet entered her back at a point below the right shoulder and emerged, relatively unmarked or otherwise altered by its target, from the area of her left breast, indicating a course slightly upward through the body. There were no powder burns in evidence. The living-dining area of the trailer, which the accused claims was the site of the shooting, is some nine feet in length, and approximately seven feet wide.

"Two civilian policemen appeared at the scene after the shooting. The victim was then lying dead in the doorway of the Judd trailer. The first officer to enter found the living room in disorder. The remains of the evening meal were still on a card table which was tilted up against a davenport. There was a partly-filled glass, unspilled, on the table. Part of a broken bowl lay on the table, while the other half was well underneath the table. One of the officers described the scene as appearing to be the site of a 'struggle.' He searched the interior for a weapon, but found none. The accused was then outside the trailer. A revolver was found shortly thereafter, under a napkin and in the center of the floor, by Deputy United States Marshal Dolan. The record does not show whether or not other persons might have entered the trailer in the interim between inspections or who may have placed the revolver there in the napkin. Officer Dolan was never called to testify. No technical evidence was ever produced to indicate that the weapon had been recently fired, or that the slug recovered from the victim's clothing came from that revolver. The weapon was found to be fully loaded, but containing one empty round. The hammer (of this 'double-action' weapon) was then resting on the next unfired round. There was no testimony introduced that the trailer had been inspected for bullet marks. A prosecution exhibit, photograph of the interior, shows a scene of the table, the floor, the gun, and the detectives' equipment. This was identified as representing the condition of the area as it was when the inspection was made.

"Accused told these investigators, and in later written pretrial statements admitted, that the weapon found was his; that he had been 'playing around' with it that night when it went off. He admitted that it was pointed in the general direction of his wife, who was then at the end of the narrow trailer, caring for the baby and bent over the child on the davenport with her back to the accused. He knew she was there and he knew the gun was pointed that way, but he didn't aim it, particularly. He was spinning the cylinder and moving the hammer back and forth; the weapon fired; the victim screamed and fell to the floor. Airman Judd states that he first dragged her to the door, went out, and started his car; he then called to his neighbors, who came to his aid. At different times he variously claimed that he was cleaning the gun; 'playing around' with the gun; that he was unloading it, or about to unload it. He later stated that he had actually lied about playing with the gun and finally had changed his earlier ver-

115

sion of 'playing' to the 'truth', since he was known to be an armament worker. He claimed not to remember what he did with the gun after it was discharged. He had purchased the gun originally for protection against his father-in-law, who didn't like him. His father-in-law had recently appeared at the Judd trailer with a gun and had threatened him. Judd had tried to get a 'peace bond' to keep his in-laws away.

"Witnesses testified that accused's duty assignment involved the handling of small arms. He had a reputation for safe-handling and operation of them, and particularly in firing them. He was well acquainted with the exact model involved here, and he was seen, at least once, properly unloading the weapon now in evidence. He had a 'bad' temper, and he was seen slapping, beating, or otherwise abusing his (pregnant) wife on more than one occasion. Since the birth of their baby, however, they 'seemed to get along'. The Judd's neighbors heard no quarreling or sounds of violence on the night of the shooting. The accused initially became acquainted with the deceased while at this base. She became pregnant and they were married shortly thereafter.

"The defense produced witnesses to indicate that the accused loved his wife, that Judd wanted a divorce only because of the interference by her parents, and that the wife had once been interviewed (in the accused's presence, however) and had then denied any physical maltreatment.

"Accused, during his own testimony, admitted having slapped his wife on occasions in the past and having struggled and argued with her. He had thought of divorce and had sought legal advice on the matter. He had kept company with another woman on occasion, to his wife's family's displeasure. Accused was previously married and divorced. He claimed there was no dissention between himself and his wife on the evening of the shooting, that they were peacefully at home and preparing to go out visiting. He explains the disarranged table and floor as being caused by his wife's striking it in falling. He admitted, but dismissed as a 'joke', earlier remarks attributed to him to the effect that his wife could go home in a 'pine box' as far as he was concerned, and that his baby son could be drowned 'like a puppy' by way of baptism. On cross-examination, and in answer to questions by the court, he admitted to having a bad temper, to have 'tapped (his wife) on the head' on an occasion when she had fallen off a porch, and to have struck her at other times when he was 'kind of mad'. He averred that statements given to the Office of Special Investigation are substantially true, and that he has told the truth 'ever since (the statement)'. A letter in evidence from his parents, written before the shooting, and warning him in effect to be careful and not to get into trouble, is explained by Judd as being in answer to one of his in which he had complained about his 'in-laws'."

Because of the wording of the specification, the board of review concluded correctly that premeditated murder and felony murder were not in issue. It further decided properly that, if the facts were sufficient to support the charge of murder, they must establish a violation of Article 118(2) or Article 118(3), Uniform Code of Military Justice, supra. After noting the two permissible solutions, the board of review went on to say there was evidence of sufficient quantity and quality to require instructions on subsections (2) and (3) of Article 118, and to prove a violation of Article 119(b)(1) of the Code, 10 USC § 919, which proscribes the unlawful taking of a human life without intent to kill or inflict great bodily harm but with culpable negligence. Finally, the board concluded the facts did not establish either an "intentional" or "selective" killing as required by Article 118(2) or the essential element of Article 118(3).

At first blush, it would appear that the findings by the board are binding

on us for there is no question about our lack of authority to reverse ordinary factual determinations made by boards of review. But, upon closer scrutiny of the decision, we are impressed by the Government's contention that the board may have weighed its facts in scales thrown out of balance by erroneous conclusions of law. Certainly, there is much language in the opinion from which it may be inferred the board reduced the offense under a misconception of the legal principles. Some of the wording—admittedly not quoted in context—which raises uncertainty in our minds is found in the three following quotations:

". . . Murder of the degree indicated by the specification used in this case is encompassed within the ranges of Article 118(2) or 118(3), Uniform Code of Military Justice, 1951. The first applies to unlawful taking of human life with an intent to kill or inflict great bodily harm. Article 118(3) on the other hand is applicable to an unlawful killing by one engaged in an act inherently dangerous to others and evincing a wanton disregard of human life. We are satisfied that there was at least a sufficient evidentiary showing here to raise both issues and thereby justify proper instructions on each of these two subdivisions of Article 118, in the alternative, . . ."

". . . We have no trouble in holding that in layman's language the accused was 'engaged in an act which is inherently dangerous to others' and that his act evidenced 'a wanton disregard of human life', which is the language of Article 118 (3). However, the layman's view, and that of many lawyers, is often not shared in judicial circles."

and

". . . As we understand the above-cited decisions, this state of facts does not provide the element of malice required for either 'type of unpremeditated murder' and we cannot affirm a conviction under Article 118. Accordingly, although we find the accused's handling of the gun to have been an act inherently danger-

ous to the lives of others, we hold that as a matter of law, we are required to find this conduct to constitute only culpable negligence within Article 119(b)(1), because of the absence of evidence showing a deliberate pointing of the weapon toward his wife and child."

Before discussing the board's consideration of murder and manslaughter founded on wanton or negligent acts, we deem it advisable to comment on its disposition of Article 118(2), murder. That facet of the crime requires an intent either to kill or inflict great bodily harm on the victim. We are satisfied the board, when disposing of that issue, made a factual determination supporting the defense contention the Government had not established beyond a reasonable doubt that the accused had the requisite intent to kill or inflict great bodily harm upon his wife. It is true the board's language is susceptible of being interpreted to the effect that in this particular type of murder the Government must always prove the accused intended to kill or do bodily harm to the particular victim. While that rule may not fit in all instances, it is not improperly applied in this case. We recognize the possibility that, had the accused intended to take the life of the baby and by poor marksmanship killed his wife, a conviction for her death under Article 118(2) might be sustainable. However, the specification herein involved alleges the murder of accused's wife, and there is not the slightest suggestion in the record he intended to kill the baby. Accordingly, whether right or wrong, when it used the expression "an intentional and selective shooting," we are certain the board of review was only intending to say the evidence was insufficient to establish a general intent to kill or do bodily injury to either the spouse or the child.

It is the next part of the board of review's opinion which causes us difficulty. Generally speaking, we believe it interpreted too narrowly the cases which have been previously decided by this Court, and, specifically, we fail to grasp the fine line of distinction which

**117**

the board makes between pointing the gun directly at the wife and pointing it toward her at the admitted close range. It may well be, as stated by the board, that when our decisions are considered collectively our language is unclear, but it is to be remembered that this particular crime with its many degrees is *sui generis* and sometimes the concepts announced in one opinion may raise some doubts about principles stated in another. However, in seeking to raise this case from the alleged state of confusion, we need not discuss all of the cases cited by the board of review for we believe a few of the general principles mentioned in some will emphasize the point we desire to make.

First, the facts in this record are sufficient to support the findings made by the court-martial and, ■ therefore, the board of review was not required to find, as a matter of law, that murder predicated on either an intent to kill or seriously injure or on the commission of an act inherently dangerous and evincing a wanton disregard for the lives of accused's wife and child was not established. The board held that much when it found within its own standards that the law officer was required to instruct on each theory.

Second, while we have held Article 118(3) applies only when the act performed is inherently dangerous and evinces a wanton disregard for the life of more than one individual, this case is within that rule for the board properly found the acts of the accused endangered both members of the family. United States v Stokes, 6 USCMA 65, 19 CMR 191; United States v Davis, 2 USCMA 505, 10 CMR 3; and other cases.

Third, malice is the element of murder which differentiates that crime from manslaughter but, ■ under Article 118(3), it is ■ that sort of mental condition which is present in the mind of a person who commits a wanton act in utter disregard of human lives. United States v Maxie, 9 USCMA

**118**

156, 25 CMR 418. Obviously, as stated by the board, malice in this instance may not be found simply from the fact that the wife was shot and killed, but it could be inferred from all the facts and circumstances surrounding this unfortunate tragedy. Explicitly, the board reasons that a layman could so find but a legal mind could not, and it reaches that conclusion by a holding that the insufficiency of the evidence to show a deliberate pointing of the weapon at the wife is fatal to a finding of murder. In considering the evidence on the wanton disregard for the rights of others, there are certain factual matters which at this level cannot be disputed. This was a small-sized room, and the accused was in close proximity to his wife. He assigns no reason for playing with a loaded weapon so close to his family, and he pulled the trigger with his thumb on the hammer. He was standing facing the two members of his family and the wife was struck in the back just below the breast level; he knew the location of the persons; he was looking at the weapon which was held high enough to bring his wife within the scope of his vision; he was certain the weapon was loaded and that it was pointed at or toward his wife; he was aware of its lethal characteristics; and he was well enough acquainted with its operation to know that pulling the trigger and thumbing the hammer—if that in fact was the cause of the firing—was dangerous to a shocking degree. From these facts, a reasonable person could find a wanton and utter disregard for the life of the victim and the baby, and that conclusion finds its support largely in accused's own testimony, which we assume was most favorable to him.

While the board of review seems to indicate it must find the accused did not knowingly point the weapon directly at his wife, such a finding was not compelled. The fact that the wife was hit in the upper part of her body from a very close range could prove the pistol was aimed at her and, from that circumstance and many other facts in the record adverse to the accused, the board of review was not bound to accept his

statement that he only pointed the weapon in her general direction, although we hasten to say it could give credence to his story if it chose to do so. Moreover, the board was not compelled to find the accused was only playing with the weapon when it fired. He had made inconsistent statements about the manner in which the tragedy happened, and there are facts and circumstances which might cause a reasonable person to believe the weapon was fired differently than in the manner described by him. While it must be emphasized that we are not suggesting the board had to make such a finding, we are pointing out that, as a matter of law, it was not compelled to accept the accused's story at face value.

In discussing the last question, we note the board affirmed a finding of manslaughter, apparently based on a belief that our opinions would not permit a finding that the accused was engaged in an act or acts which could be characterized as inherently dangerous and in wanton disregard of the life of his family. All triers of fact encounter difficulties in bridging the gap between the degrees of homicide, and perhaps the board was baffled as to what factors in this case would support a finding of implied malice. In this instance, it apparently concluded the line of departure was determined by the deliberateness with which the weapon was pointed at a particular individual. More precisely, it reasoned if the accused deliberately pointed the weapon at his wife malice could be inferred, but if he merely pointed the revolver toward her that element would be absent. This is the point where we encounter difficulty for, when a person knowingly triggers a weapon which is pointed in the direction of two individuals stationed only four or five feet away and directly in the line of his vision with such a disregard for their lives that he hits one squarely in the back, he is not so far off target that reasonable men must conclude he did not have that calloused indifference toward the probable consequence of his act which would support a finding of implied malice.

It must be conceded the board of review concluded that the sum total of accused's conduct leading up to the homicide did not extend his behavior beyond culpable negligence, but, as previously noted, the narrow ground upon which it seemed to base its opinion would not be the dividing line as a matter of law. It could be as a matter of fact but, if the board intended to so hold, it does not inform us to that effect. Certainly, if the board members concluded the evidence in its totality was insufficient as a matter of fact to convince them beyond a reasonable doubt that the accused was guilty of the greater offense, then they were legally and properly within their province as triers of fact in finding him guilty of only the lesser offense. However, if they were of the opinion that, regardless of their beliefs on his wanton disregard for others, the law as announced by this Court demanded a reduction in the charge, then they erred. Because we are not sure of the grounds upon which they based their decision, we are returning the record to the board for further consideration. United States v Moreno, 5 USCMA 500, 18 CMR 124. By doing so, we do not wish to be understood as expressing any opinion on the weight or sufficiency of the evidence to support the court-martial's findings except that it is adequate as a matter of law.

Judge FERGUSON concurs.

Chief Judge QUINN concurs in the result.