UNITED STATES, Appellee

v

ORVILLE W. JUDD, Airman Second Class,
U. S. Air Force, Appellant

11 USCMA 164, 28 CMR 388

No. 11,901

Decided January 22, 1960

*C. Robert Bard, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Guy Emery, Esquire, Lieutenant Colonel James L. Kilgore,* and *Captain Norman J. Nelson.*

*Major Lawrence J. Gross* argued the cause for Appellee, United States. With him on the brief were *Colonel John F. Hannigan* and *Lieutenant Colonel Robert W. Michels.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convicted the accused of the murder of his wife in their trailer home near Anchorage, Alaska, and imposed a sentence which included a dishonorable discharge and

confinement at hard labor for twenty-five years. On review, a board of review reduced the findings of guilty to involuntary manslaughter and reassessed the sentence by reducing the period of confinement to three years. The Judge Advocate General of the Air Force certified the case to this Court to review the correctness of the board of review's action, reducing the findings of guilty. From the opinion of the board of review, we were unable to determine whether it based its decision upon new findings of fact, or upon an erroneous conception of the applicable principles of law. Accordingly, we returned the record of trial to the board of review for clarification of its action. United States v Judd, 10 USCMA 113, 27 CMR 187.

On further review, the board of review emphasized that its earlier action had been predicated upon its interpretation of the rules of law. It affirmed the court-martial's finding of guilty of murder, and approved a sentence which includes confinement at hard labor for twenty years. The accused then petitioned this Court for review alleging eight grounds of error.

Three of the alleged errors pertain to the evidence. First, it is contended the board of review erred in holding "that the evidence of the record establishes any wrongful act on the part of the accused." The pertinent facts are set out in the opinion on the first appeal. We there held that as a matter of law the evidence was sufficient to sustain the findings of murder. It follows, therefore, that there is no merit to this assignment of error.

A second allegation of error in regard to the evidence is that the board of review incorrectly concluded that the admission of certain hearsay testimony did not prejudice the accused. The challenged testimony was given by the mother-in-law of the accused, in cross-examination by the assistant defense counsel. Earlier, other witnesses testified to the relations between the accused and his wife. In her direct examination the mother-in-law testified that "Towards the last . . . [the accused and his wife] didn't get along at all"; frequently the accused would "backhand her across the mouth" and inflict "black and blue marks" on her; he called her "bad names"; and he was generally "mean and cruel to her." In the course of the direct examination there were several appropriate defense objections on the ground of hearsay. On cross-examination the witness was asked the following question and gave the answer indicated.

"Q. Did your daughter indicate to you she wanted to leave her husband?
"A. She said—I know you can't prove it, but she said, 'If I leave him, he threatened to kill me.' "

The answer was generally responsive to the question. Having elicited the answer and having made no effort at the trial to strike it from the record, the defense cannot now contend that the testimony was prejudicial to its case. See United States v Holley, 5 USCMA 661, 18 CMR 285.[1]

The third contention relating to the evidence is that it does not support the instruction by the law officer which allowed the court-martial to return a verdict of guilty of murder if it found either that the accused had an intent to kill his wife, or that he was engaged in an act inherently dangerous to others and showed a wanton disregard of human life. The following quotation from our opinion on the first appeal provides a full and adverse answer to this contention.

"First, the facts in this record are sufficient to support the findings made by the court-martial and, therefore,

---

[1] The claim of prejudice made here is different from the use of inadmissible hearsay to support the findings of guilty. On the first appeal we considered the competent evidence, not inadmissible hearsay, to determine the legal sufficiency of the evidence. Cf. United States v Wilson, 2 USCMA 248, 8 CMR 48; United States v Carrier, 7 USCMA 633, 23 CMR 97.

the board of review was not required to find, as a matter of law, that murder predicated on either an intent to kill or seriously injure or on the commission of an act inherently dangerous and evincing a wanton disregard for the lives of accused's wife and child was not established. The board held that much when it found within its own standards that the law officer was required to instruct on each theory.

"Second, while we have held Article 118 (3) applies only when the act performed is inherently dangerous and evinces a wanton disregard for the life of more than one individual, this case is within that rule for the board properly found the acts of the accused endangered both members of the family. United States v Stokes, 6 USCMA 65, 19 CMR 191; United States v Davis, 2 USCMA 505, 10 CMR 3; and other cases."

Moving to the post-trial proceedings, the accused maintains he did not have a full and impartial review by the convening authority. The claim is predicated partly upon the fact that the assistant staff judge advocate who prepared the post-trial review had before trial also prepared a memorandum for trial counsel for the trial of the case, and partly upon a comparison of the two documents for the purpose of showing that he "took a partisan interest" in the proceedings. It is, of course, not always easy to mark the line between permissible official action in the pretrial and post-trial proceedings, and partisan participation. See United States v Turner, 7 USCMA 38, 45, 21 CMR 164. Mere preparation of the pretrial memorandum did not disqualify the assistant staff judge advocate from later review of the record of trial. United States v Haimson, 5 USCMA 208, 17 CMR 208; United States v DeAngelis, 3 USCMA 298, 12 CMR 54. We have read appellate defense counsel's comparison of the two documents and we find nothing to support the claim of partisanship. Appellate defense counsel characterizes the assistant staff judge advocate's state-ment that the accused "took the stand and . . . admitted that his wife died from a bullet wound from a gun discharged while in his hands" as a "biased, direct and unconscionable misstatement of fact." He contends that the accused "Nowhere . . . [made] any such admission." While the accused did not in fact say his wife died from the wound of a bullet fired from a gun in his hands, he had earlier stipulated to a certificate of death which showed that his wife's death occurred "instantaneously" as a result of a "gun shot wound," and he expressly admitted his wife was shot by a bullet discharged from a gun he was holding. The following excerpts from the record of the accused's testimony constitute sufficient refutation of the accused's claim of unconscionable misstatement.

"Q. Wayne, directing your attention to the night of the accident, will you please tell the court what happened?

"A. Well, I went home from work between 4:15 and 4:30 that afternoon, and stopped by Airman Backhaus's house and left a note, he wasn't home, I left a note for him to go out to Sergeant Degler's house, a sergeant down at the warehouse, to go fishing. From there I went on home. So I got home, I parked my car there, went inside, and, well, I think the paper was there, then I read a little bit out of the paper. The baby started crying, I picked it up, my wife was cooking supper, so I picked the baby up. We let the baby cry all the time so it will get hungry. And so she started warming up the food, baby food, brought it over to me. I started feeding it. In the meantime she went back to the stove, she was cooking supper, and so then she set supper down on the table and she started eating, I told her to eat, she started eating. She got about done, so I handed her the baby and I started eating. She kept feeding the baby. Then after I got through, I went on into the bathroom. After I came out of the bathroom, I laid down on the bed there and was reading a book. So she said, 'Honey, if

167

you will help me clear up the table, we can go over to Ronnie's.' I said, 'O.K.' So I went in the other room.

. . . . .

"Q. Again I hand it to you. (Hands gun back to the witness.) Will you please tell the court, show the court what happened when you picked up the gun that night.

"A. I was going to unload it, I started playing with it, started using the gun like this (demonstrating). The second time it went off.

. . . . .

"Q. Please tell the court what happened then.

"A. Well, the second time I did it, it went off. I heard my wife scream, I ran over to her, threw the gun down, I don't know where it went, I dropped it, I don't know what happened to the gun. I started pulling my wife to the door, I was going to take her to the hospital in the car.

"Q. As she was hit, what happened?

"A. She fell on the floor.

"Q. She fell?

"A. Yes, sir.

"Q. Did she make a noise?

"A. Screamed.

"Q. She screamed and fell. Did she hit anything as she fell?

"A. She hit the table.

"Q. Then what happened?

"A. Well, I picked her up underneath the arms, was pulling her towards the door, I was going to take her and put her in the car. I got her to the door, I couldn't get no farther. I went to the car and started it up, went back to her, and started yelling for somebody to help to take her to the hospital. This guy came over and I asked him to help me put her in the car and take her to the hospital. He wouldn't do it.

. . . . .

"Q. [TC]. So you started dragging your wife towards the door. How long did it take you, after she had been shot, to get her out to the door, to the outer door?

"A. I don't know, sir, it seemed to me a long time.

"Q. It took you a long time to drag her out?

"A. I said it seemed like a long time.

"Q. Why did you then leave her and go start the engine of your car?

"A. To take her to the hospital."

The remaining allegations of error relate to the further action of the board of review after the remand. The first allegation is to the effect that the action of the board of review on remand was "inconsistent and anomalous" with the action it took on the first review. It is contended that since the board of review said on the second review that it was basing its finding on "facts supplied by the accused," there was not "any scintilla of evidence to warrant an instruction on [Article] 118(2)." Therefore, the argument continues, the board of review was wrong when it held initially that the evidence was sufficient to support an instruction on both subsections 2 and 3 of Article 118. The argument overlooks the fact that the amount of evidence required to raise an issue for instruction purposes is less than the amount of evidence required to support a finding of guilty. There may be enough evidence to require an instruction, yet not enough to justify affirmance of a conviction of guilt beyond a reasonable doubt. The board of review held that the evidence was not sufficient to support a finding of guilty of subsection 2. As a result, errors that may have been committed by the admission of evidence tending to support a conviction of that offense, which seems to be the accused's real complaint, were eliminated as a basis for further review, and the board of review acted properly in choosing to pass over a discussion of them. See United States v McCluskey, 6 USCMA 545, 20 CMR 261; United States v Reese, 5 USCMA 560, 18 CMR 184.

Next, the accused contends the board of review erred by failing to obey the mandate of this Court. We returned the record of trial to the board of review indicating we were not sure of the grounds upon which it based its holding reducing the findings of guilty from

murder to involuntary manslaughter. United States v Judd, supra, page 119. We noted that if the findings were predicated upon the erroneous principles of law announced in the opinion, the board of review was wrong in its conclusion; but if the finding was based upon a factual determination, the board of review was "legally and properly within . . . [its] province." The accused maintains that on remand, the board of review did not define the basis for its initial action but merely proceeded to hold what this Court had already determined, namely, that as a matter of law it was sufficient to support a finding of guilty of murder under subsection (3) of Article 118. We do not so read the board of review's decision upon further review. The board of review expressly refers to our mandate, and then proceeds to enumerate the findings of fact it made in its previous review. These "former finding[s] of fact," the decision observes, establish, under the principles announced in our opinion on remand, that the accused was guilty of a violation of Article 118(3). All that the board of review did, was to reaffirm, as it was bound to do, the findings of fact it had previously made. These, the board pointed out, establish the accused's guilt beyond a reasonable doubt. We conclude, therefore, that the board of review adhered literally to the terms of our mandate.

Finally, the accused contends the board of review erred in regard to the sentence. The first part of the claim is addressed to a statement by the board of review in which it said it had considered the "sentences finally approved in over a hundred other military cases . . . of unpremeditated murder." It is asserted that this statement shows the board of review considered matters outside the record to sustain the sentence. Whether a board of review, as a permanent appellate tribunal, may consider sentences adjudged in other cases as a circumstance bearing upon appropriateness of a sentence in a particular case need not detain us. Cf. United States v Mamaluy, 10 USCMA 102, 27 CMR 176. The statement here was made in an effort to assess the harmful effects of certain inadmissible evidence. It is arguable that the purpose and the result did not prejudice the accused. Be that as it may, it is clear the board of review reassessed the sentence *on the facts of this particular case,* and affirmed a sentence which it believed was just and appropriate.

The second part of the sentence assignment of error is that the board of review could not reassess a sentence which extends to confinement at hard labor for more than three years. We considered a similar contention in regard to the convening authority in United States v Jones, 10 USCMA 532, 533, 28 CMR 98. We pointed out in that case that a sentence approved on initial review is binding in all subsequent proceedings in the case, unless the sentence action was "expressly and solely predicated on an erroneous conclusion of law." Since the reduction effected by the board of review on the first review was based solely upon an erroneous view of the applicable law, the board of review was not precluded from reassessing the sentence on the basis of the correct findings of guilty.

The decision of the board of review is affirmed.

Judge LATIMER concurs.

FERGUSON, Judge (concurring in the result):

I concur in the result.

While I agree generally with the discussion of the assigned errors and the disposition ordered, I am disturbed by the implication of the principal opinion that a board of review may average out the "sentences finally approved in over a hundred other military cases . . . of unpremeditated murder" in determining the *quantum* of the penalty which should be approved in this case.

Uniform Code of Military Justice, Article 66, 10 USC § 866, provides pertinently:

"(c) In a case referred to it, the

169

board of review may act only with respect to the findings and sentence as approved by the convening authority. It may affirm only such findings of guilty, *and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved.*" [Emphasis supplied.]

The legislative history makes it clear that it was the congressional purpose in enacting the foregoing section of Code, supra, Article 66, to insure that a board of review might set aside, on the basis of the record, any part of a sentence, either because it is illegal or because it is inappropriate. It was also contemplated that this power would be exercised to establish uniformity of sentences throughout the armed forces. Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, page 1137; House Report No. 491, 81st Congress, 1st Session, page 31; Senate Report No. 486, 81st Congress, 1st Session, page 28. However, it is equally certain that inclusion of the phrase "on the basis of the entire record" has some meaning. See United States v Lanford, 6 USCMA 371, 20 CMR 87. In my opinion, it at least forbids the boards from utilizing the approach of a computing machine in assuring uniformity of sentences, for that desirable quality must be attained in light of the equally important injunction that the *quantum* of punishment be fixed as it is specially suited to the circumstances of accused's case. United States v Atkins, 8 USCMA 77, 23 CMR 301.

Moreover, the apparent conflict in the desire for uniformity and individual treatment can be reconciled within the terms of the quoted section of Code, supra, Article 66. I am certain that mathematical calculation is not the type of uniformity which Congress deemed desirable. It seems more likely to me that it was envisioned that members would utilize the experience distilled from years of practice in military law to determine whether, in light of the facts surrounding accused's delict, his sentence was appropriate. In short, it was hoped to attain *relative* uniformity rather than an arithmetically averaged sentence. Thus, I would conclude it to be improper for a board of review to refer solely to statistical data in determining the sentence to be approved.

Be that as it may, I am certain the board of review in this case did not fall into error in judging the appropriateness of accused's penalty. While their memorandum of opinion adverts to the average sentence for unpremeditated murder in over one hundred military cases, they proceeded to affirm a substantially smaller period of confinement in view of the particular circumstances involved. The Code commands no more than that, and I, accordingly, join in affirming the board's decision.