UNITED STATES, Appellant

v

MICHAEL C. REMELE, Airman Second Class,
U. S. Air Force, Appellee

13 USCMA 617, 33 CMR 149

No. 16,268

April 5, 1963

*Captain Richard T. Yery* argued the cause for Appellant, United States. With him on the brief was *Lieutenant Colonel Emanuel Lewis.*

*Major Charles K. Rush* argued the cause for Appellee, Accused. With him on the brief was *Colonel Joseph E. Krysakowski.*

## Opinion of the Court

FERGUSON, Judge:

Remele was brought to trial before a special court-martial convened at Forbes Air Force Base, Kansas, upon five specifications of wrongfully and dishonorably failing to maintain sufficient funds on deposit to meet the payment upon presentment of certain checks which he had uttered, in violation of Uniform Code of Military Justice, Article 134, 10 USC § 934. He was found guilty and sentenced to bad-conduct discharge, forfeiture of $43.00 per month for six months, confinement at hard labor for six months, and reduction to the lowest enlisted grade. The convening authority approved the sentence. The supervisory authority reduced the period of confinement and forfeitures to four months but otherwise approved the punishment. The board of review set aside the findings of guilty concerning specifications 1, 2, and 3 of the Charge and reassessed the sentence. The case was certified to this Court by The Judge Advocate General of the Air Force upon the following questions:

"1. AS A MATTER OF LAW WAS THE BOARD OF REVIEW CORRECT IN ITS DETERMINATION THAT 'TIMELY' REDEMPTION, STANDING ALONE, NEGATED 'THE ELEMENT OF DISHONOR' WITH REGARD TO SPECIFICATIONS 2 AND 3 OF THE CHARGE?

"2. WAS THE BOARD OF REVIEW CORRECT IN ITS DETERMINATION THAT ACCUSED'S CONDUCT AFTER NOTICE OF DISHONOR OF THE CHECKS MAY BE CONSIDERED ON THE QUESTION OF WHETHER AN ISSUE OF MISTAKE OF FACT WAS RAISED?

"3. IF THE ANSWER TO THE FOREGOING IS IN THE AFFIRMATIVE, WAS THE BOARD OF REVIEW CORRECT IN ITS DETERMINATION THAT AN ISSUE OF MISTAKE OF FACT WAS NOT REASONABLY RAISED BY THE EVIDENCE IN THIS CASE SO AS TO REQUIRE AN INSTRUCTION THEREON?"

The first check uttered by the accused is involved only in the specification which is not before us. Nevertheless, evidence relating to it is relevant to demonstrate some of the background of this case. It was issued in the amount of $3.00 to "Logans '66' Service," Topeka, Kansas, on September 8, 1961, in return for gasoline. It was presented for payment on September 18, 1961, and returned to the proprietor of the payee service station, Mr. Logan, as accused's bank balance on the date of presentment was eighty-

four cents. Mr. Logan testified initially that he informed the accused of its return, but later declared that he "never got a chance to contact him about the $3.00 check."

On January 30, 1962, accused gave Mr. Logan another check in the amount of $65.00 in payment of his account, a new tire, and some other "insufficient fund checks." It is not clear from the record whether the latter items had been given "on an IOU basis," or whether the earlier $3.00 instrument was included in the group. The check was presented for payment on the date of its utterance. Payment was refused by the drawee bank on the ground of insufficient funds, the accused's balance then standing at $8.66.

Mr. Logan contacted the accused on the following day. Remele told him "he would go and get it straightened out, that there was something wrong at the bank." At the time, the accused was accompanied by another young man, who returned a "day or two later . . . and said he was going to take care of this check."

Logan had cashed "quite a few" checks for accused in the past, some of which were IOU's. He had "no doubt in the world but what he will pay me" for the $65.00 check.

Other testimony established that accused uttered two checks to the Base Exchange in return for cash on January 26 and 29, respectively, each in the amount of $10.00. These checks were received by the drawee bank on January 30 and 31 and were returned unpaid, as accused's balance on each of these days stood at $8.66. Both checks were redeemed by an individual who identified himself as "Airman Remele's landlady's son." He also paid the Exchange a required service charge for handling the returned checks.

On January 30, 1962, accused issued another check in the amount of $20.00 to Lester E. Reiber, proprietor of a local liquor store, receiving a package of beer and approximately $18.75 in cash. The check was presented for payment at accused's bank on February 6, 1962. It was not honored, as Remele's account balance was only $3.83. Upon its return, Mr. Reiber sought to contact the accused but was unable to do so.

Accused's account was "quite active" for a special checking account in which a service charge of ten cents was levied for each instrument written. According to the cashier, during the latter part of January or the early part of February, there "was some question about a deposit that Mr. Remele claims he had made that we were unable to find a record of." To the cashier's knowledge, the alleged discrepancy in the account was, from the bank's standpoint, unfounded.

In answer to the foregoing matters, accused testified as follows:

"A. On or about 15 January 1962, I became involved with a fellow who was off the Base. He said he had a cabin in Nebraska that he was selling. He went up to Nebraska and signed the release papers. His father said the money would be sent to the Merchants National Bank the next morning, in the amount of $8500.00. The next morning, he came out and said the money was there but there was some confusion. It was a two-party check, and they had to contact the bank in Nebraska for verification of the check. I took him back that afternoon, and he said the check was back and had been deposited in his account, but he would not be able to write any checks on it because he had been notorious for writing bad checks. The next morning, he said he had transferred $100.00 out of the $8500.00 that he got from Nebraska, into my account. I asked for a deposit slip at that time, and he said, 'Well, I didn't get one.' I asked him why he didn't get a deposit slip, because I know you don't deposit money without getting a slip. He said, 'I didn't get one. I just transferred the money from my account to yours.' I let it go. The next day, he said he had deposited another $100.00, making a total of $200.00. It was on the basis of this $200.00 that the checks were written."

**619**

Accused identified the "fellow . . . off . . . Base" as his roommate, one Kerry A. Titze. He went on to state:

"Q Had you previously had any reason to doubt this person if he told you something?

"A Once or twice I doubted his word, but he was always able to talk his way out of it.

"Q Did you doubt that he had the money transferred to your account?

"A After the second $100.00, I did doubt him.

"Q This was after you had written the checks?

"A Yes, sir.

"Q You believed that he had put this money in your account?

"A Yes, I did. He went to great length to cover up what he had done. He went to a pay telephone booth to make a call, after I found out the money had not been deposited. After the two checks had been returned to the Base Exchange, I checked into it and there was no money in my account. No money had been deposited. He went into a pay telephone booth and said he was telephoning his father. It is my belief that he never reached his father. He said he was telephoning his father.

"Q After you found out that he had lied to you, at this time did you approach him on this matter about the money?

"A I approached him many times on it.

"Q When you approached him, what did he do? Did he make any of the checks good?

"A No, sir.

"Q Did he come out here and redeem the two $10.00 checks at the Forbes AFB Exchange?

"A Yes, sir.

"Q Airman Remele, have you approached him about these other checks?

"A Yes, sir, I have.

"Q What is the reason you have not taken care of these checks, as of today?

"A My financial status mainly.

. . . . .

"Q Explain to the court exactly what you, in your own opinion, feel about the funds that should be in the bank to cover these checks?

"A Well, the checks that I wrote were in good faith. I thought the money was there and, just as I told Mr. Logan, when I was there, the fellow was there beside me. He said the money was there. The $65.00 check was over and above the $50.00. I gave it to Mr. Logan to pay off a bill and to buy a new tire, which came to $55.00. At that time, Kerry said the money was in the bank. As a matter of fact, he said he had deposited the money that day. He stood beside me and said he had deposited the money."

After the second alleged deposit, accused called the bank. According to him, "they checked their records" and "they could find no evidence" of the deposits. The "initial $100.00" was "to cover the checks" which accused had written on Titze's behalf, as the latter was not permitted to have a checking account "because of this penalized check deal."

In support of his testimony, accused adduced the testimony of Miss Constance K. Chestnut who stated she had heard Titze inform accused that he had personally deposited "$100.00 and $200.00" to accused's account. In a similar manner, Mr. Frederick Carroll testified:

"Titze told Mike he would put money in Mike's account, because he (Titze) couldn't write checks. He said he would work out a deal where he would put the money in Mike's account, and Mike could write the checks."

Titze also wanted Carroll "to write checks." Carroll "thought it was all right" but, "[a]fter Mike's checks started bouncing back, about three or four weeks later, mine started bouncing, too."

In rebuttal, the prosecution presented the testimony of a Major Clyde Hart, who had been appointed to conduct an

investigation concerning accused. In an interview with the accused, in which the latter was properly advised of his rights under Code, supra, Article 31, 10 USC § 831, Remele informed him that a deposit should have been made in his bank account from a trust fund of which he was the beneficiary. In addition, accused told him that "he had deposited, I believe, the sum of $185.00, or right around that amount." He made no mention of "a friend depositing $200.00 in his account," although he did state "his friend picked up two checks that had been written on the Forbes Air Force Base Exchange, and the friend made the checks good for him."

Thereafter, the case was submitted to the special court-martial upon the arguments of counsel and the instructions of the president. Although the former dealt almost exclusively with the defense of mistake of fact, the latter made no mention of the legal principles involved. Having carried the ball to the five-yard line, both counsel promptly threw it down.

Regarding the first certified question, it is to be pointed out that the assignment before the board regarding these specifications urged legal *and factual* insufficiency as a ground for reversal. The board specifically held that "the element of dishonor has not been established *in fact* or in law with respect to these specifications." (Emphasis supplied.) As we read its opinion, the board acted on the basis of its fact-finding powers, and we cannot overturn its conclusion. The question, therefore, need not be answered. United States v Judd, 10 USCMA 113, 27 CMR 187; United States v Wheatley, 10 USCMA 537, 28 CMR 103.

Turning to the second and third certified questions, it is obvious that they seek, in different ways, to ascertain whether the board of review was correct in holding that the evidence before the court-martial did not raise an issue of honest mistake.

If an accused, at the time he utters a check, honestly believes that there will be sufficient funds on deposit in his account to meet the obligation which the check represents when it is presented for payment, and continues so to believe until such presentment, he cannot be found guilty of dishonorable failure to maintain sufficient funds to permit its redemption. United States v Downard, 6 USCMA 538, 20 CMR 254; United States v Rowan, 4 USCMA 430, 16 CMR 4. And where there is *some evidence in the record* that accused was honestly mistaken with regard to the status of his account, an issue is raised which requires instructions by the law officer concerning its effect. United States v Judd, 11 USCMA 164, 168, 28 CMR 388, 392; United States v Thornton, 8 USCMA 446, 449, 24 CMR 256, 259; United States v Shaw, 13 USCMA 144, 146, 32 CMR 144, 146. Indeed, as we recently declared in United States v Smith, 13 USCMA 471, 33 CMR 3, it "is required, *inter alia,* that instructions be given at trial not only on the elements of the offense but, in addition, on all issues, defenses, and lesser offenses raised reasonably by the evidence."

The mental state which accompanies an accused's acts normally must be inferentially established by the United States as, absent a voluntary confession, it necessarily cannot probe his faculties to determine precisely what cerebrations led him to do that which forms the basis of the charge against him. On the other hand, the accused is under no such restraint and has the capacity to testify directly to the intent, knowledge, or other *mens rea* which fills out and characterizes his acts either as criminal or legally blameless. And in this case, he did precisely that, for he repeatedly testified that he honestly believed funds would be available to meet each of the checks involved upon their presentment for payment. Indeed, he did more, for he presented two witnesses who swore they had heard Titze inform the accused that the money had been deposited. Moreover, the evidence also establishes the accused, upon the dishonor of his checks, approached the bank and initiated an investigation to

see whether the alleged deposits had somehow failed to be credited to his account. Under these circumstances, it must be concluded there is "some evidence" of an honest mistake on Remele's part. United States v Shaw, supra; United States v Black, 12 USCMA 571, 31 CMR 157.

The board of review's opinion actually concedes as much, for, after discussing the evidence, it declares:

"In these circumstances, *even if the accused was completely honest in his belief that the deposits had been made for him, his subsequent conduct offsets that and removes his entitlement to an instruction on mistake of fact.*" [Emphasis supplied.]

This is no more than weighing the evidence in the record and, contrary to what we said in United States v Judd, supra, applying the test of legal sufficiency to determine whether an issue is raised. In short, what the board erroneously did here was to measure the credibility of the defense witnesses *vis a vis* those of the Government in order to hold there was no mistake of fact involved.

As a mistake of fact was, therefore, raised by the evidence, it follows that the board of review erred in its affirmance of the findings of guilty as to specifications 4 and 5 and the sentence. A rehearing on those specifications is, accordingly, necessitated.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Air Force. A rehearing may be ordered on specifications 4 and 5 of the Charge.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

The board of review dismissed specifications 2 and 3 on the ground the evidence relating to those specifications bore a marked similarity to "the factual situation in United States v Groom . . . [12 USCMA 11, 30 CMR 11], where the Court of Military Appeals held that *such evidence was insufficient in law*" to establish dishonorable conduct on the part of the accused. (Emphasis supplied.) The comparison seems to indicate that the board of review dismissed these specifications because the evidence was insufficient in law to support them. However, the majority's answer to the other certified questions makes it unnecessary for me to do more than express my reservations about this aspect of the case. As to the question of whether there is sufficient evidence to require an instruction on the effect of a reasonable belief there were sufficient funds on deposit to pay the checks on presentment, I disagree with my brothers.

An instruction on the effect of a theory of defense is required if "the record of trial contains sufficient credible evidence raising an issue for the court-martial's consideration." United States v Farris, 9 USCMA 499, 501, 26 CMR 279. See also United States v Gurevich, 7 USCMA 203, 21 CMR 329. The Government contends that the accused's testimony is so "characterized by a series of patent inconsistences" as to raise no issue of mistake of fact justifying an instruction. See United States v Bistram, 11 USCMA 345, 29 CMR 161.

At trial, the defense attempted to show that the accused issued the checks, which became the subject of the charges, in the honest belief that a friend, Kerry A. Titze, had previously deposited $200.00 to his account, which amount was sufficient to pay the checks. Titze was not called as a defense witness. Two other witnesses were called to corroborate the accused. Miss Constance Chestnut said she was present at a conversation between Titze and the accused, in which Titze said he *had* deposited $200.00 to the accused's account. The other witness said he heard Titze tell the accused he *"would* put money in . . . [the accused's] account." (Emphasis supplied.) Neither witness testified to the date of the respective conversations; and it does not appear that they testified about the *same* conversation. The accused's own testimony compellingly establishes that if these conversations took place, they were had after the checks were presented to, and refused payment by, the bank.

622

Disregarding the September 1961 check, which was the subject of specification 1, the accused was charged with issuing four worthless checks. The first check for $10.00 was issued to the Forbes Air Force Base Exchange on January 26, 1962; the second, also for $10.00, was issued on January 29, to the Exchange; the third for $65.00 was issued to Logan's Service Station on January 30; and the fourth for $20.00 was issued to Lester E. Reiber on January 30. The accused admitted he knew that before these checks were issued he had reduced his bank account to "almost a Zero balance." He contended, however, that "the checks were written" on the "basis" of the $200.00 deposited by Titze.

According to accused's testimony, he had become "involved" with Titze about January 15. They were roommates and friends, but were not "real close." "Once or twice" the accused had doubted Titze's truthfulness, but Titze "was always able to talk his way out of it." Titze purportedly told the accused he had sold some real property in Nebraska for which he received $8,500.00. He said he deposited this amount to his account in the Merchants National Bank, the same bank in which the accused had an account. Titze was "notorious" for writing bad checks, which the accused knew, so he purportedly arranged with the accused to have the accused write checks for him against money which Titze would deposit in the accused's account. One day Titze told the accused he had deposited $100.00. The accused knew the bank issued a deposit slip for each deposit, so he asked Titze for the slip. Titze told him he had not received one because he "just transferred the money" from his account to the accused's. The next day, Titze told the accused he had deposited another $100.00 in the accused's account. As noted above, the accused purported to write all the checks "on the basis of this $200.00." However, other testimony by the accused demolishes this contention, and eliminates the foundation of any claim of good faith.

The accused said that when he gave Mr. Logan the $65.00 check on January 30, Titze was present, and he told Logan that "he [Titze] had deposited the money that day."[1] Since the accused purported to issue the checks on the two deposits, the statement attributed to Titze set the date of the alleged second deposit as January 30. Yet, the first check was issued on January 26. The accused's testimony on this crucial point is so inconsistent with the admitted facts as to stamp his claim of good faith as "inherently unbelievable." United States v Bistram, supra, page 347. I conclude, therefore, that while the board of review erred in giving improper effect to the accused's post-presentment conduct, it was correct in its conclusion that the evidence raises no issue requiring an instruction on honest belief. I would answer the third question in the affirmative, and affirm the decision of the board of review.

---

[1] Logan's testimony on the point would support an inference that Titze did not make the statement attributed to him by the accused. His testimony on cross-examination is as follows:

"Q. Now you stated that there was someone else with Airman Remele when he gave you this check, did you not?

"A. Yes, sir.

"Q. Did this other person tell you anything with regard to money in the bank?

A. A day or two later he came in and said he was going to take care of this check."