UNITED STATES, Appellee

v

WILLIAM L. CALLEY, JR., First Lieutenant, U. S. Army,
Appellant

No. 26,875

December 21, 1973

*George W. Latimer, Esquire,* and *Captain J. Houston Gordon* argued the cause for Appellant, Accused. With them on the brief was *Captain Richard M. Evans.*

*Captain Robert C. Roth, Jr.,* and *Captain M. Douglas Deitchler* argued the cause for Appellee, United States. With them on the brief were *Lieutenant Colonel Ronald M. Holdaway* and *Captain Merle F. Wilberding.*

## OPINION

QUINN, Judge:

First Lieutenant Calley stands convicted of the premeditated murder of 22 infants, children, women, and old men, and of assault with intent to murder a child of about 2 years of age. All the killings and the assault took place on March 16, 1968 in the area of the village of My Lai in the Republic of South Vietnam. The Army Court of Military Review affirmed the findings of guilty and the sentence, which, as reduced by the convening authority, includes dismissal and confinement at hard labor for 20 years. The accused petitioned this Court for further review, alleging 30 assignments of error. We granted three of these assignments.

We consider first whether the public attention given the charges was so pernicious as to prevent a fair trial for the accused. At the trial, defense counsel moved to dismiss all the charges on the ground that the pretrial publicity made it impossible for the Government to accord the accused a fair trial. The motion

was denied. It is contended that the ruling was wrong.

The defense asserts, and the Government concedes, that the pretrial publicity was massive. The defense perceives the publicity as virulent and vicious. At trial, it submitted a vast array of newspaper stories, copies of national news magazines, transcripts of television interviews, and editorial comment. Counsel also referred to comments by the President in which he alluded to the deaths as a "massacre" and to similar remarks by the Secretary of State, the Secretary of Defense, the Secretary of the Army, and various members of Congress. Before us, defense counsel contend that the decisions of the United States Supreme Court in Marshall v United States, 360 US 310 (1959), Irvin v Dowd, 366 US 717 (1961), and Sheppard v Maxwell, 384 US 333 (1966) require reversal of this conviction. In our opinion, neither the cited cases, nor others dealing with pretrial publicity and its effect upon an accused's constitutional right to a fair trial, mandate that result.

■ Under our constitutional system of government and individual rights, the exercise of a constitutional right by one person can affect the constitutional right of another. Thus, the First Amendment guarantees to the public and the news media the right to comment on and discuss impending or pending criminal prosecutions. The content of the comments can pose a danger to the right of an accused to the fair trial assured by the Due Process clause of the Fifth Amendment. The accommodation of such competing rights has been, and will continue to be, a challenge to the courts. As we construe the Supreme Court's decisions in this area, the trier of the facts, and more particularly, a juror, is not disqualified just because he has been exposed to pretrial publicity or even has formulated an opinion as to the guilt or innocence of an accused on the basis of his exposure. "[I]f the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court," he is qualified to serve. Irvin v Dowd, supra at 723. The difficulty is that sometimes the impact of the quantity and character of pretrial publicity is so patently profound that the juror's personal belief in his impartiality is not sufficient to overcome the likelihood of bias, as assessed by the court. *Id.* at 728; see also United States v Deain, 5 USCMA 44, 17 CMR 44 (1954). Our task, therefore, is not merely to ascertain that there was widespread publicity adverse to the accused, but to judge whether it was of a kind that inevitably had to influence the court members against the accused, irrespective of their good-faith disclaimers that they could, and would, determine his guilt from the evidence presented to them in open court, fairly and impartially.

■ We have reviewed the material submitted to support the defense argument on the issue. In contrast to the publicity in some of the cases cited, most of the matter is factual and impersonal in the attribution of guilt. Many accounts note that the accused had not been tried and the question of his culpability remained undetermined by the standard of American law. A number of editorials appear to regard the tragedy as another reason to deplore or oppose our participation in the war in Vietnam. A considerable amount of the material is favorable to Lieutenant Calley; some stories were largely expressions of sympathy.

First official government statements were to the effect that a full investigation would be conducted to determine whether the killings took place and, if so, to establish the identity of those responsible. Later statements described what occurred at My Lai as a massacre and promised that those who perpetrated it would be brought to justice. By the time of the trial few persons in the United States who read, watched or listened to the daily news would not have been convinced that many Vietnamese civilians, including women and children, had been killed during the My Lai operation. It is by no means certain, however, that the conviction that people had died included a judgment that Lieutenant Calley was criminally responsible for those deaths. Our attention has not been called to any official statement or report that demanded Lieutenant Calley's conviction as the guilty party.

Unlike the situation in the *Sheppard*

case, neither the trial judge nor government counsel ignored the potentially adverse effect of the extensive publicity. In pretrial proceedings, the prosecution labored jointly with the defense to minimize the effects of the publicity. The military judge issued special orders to prospective witnesses to curb public discussion of the case and to insulate them from the influence of possible newspaper, magazine, radio and television reports of the case. At trial, the judge was exceedingly liberal in the scope of the voir dire of the court members and in bases for challenge for cause, but defense counsel challenged only two members because of exposure to the pretrial publicity.

We have carefully examined the extensive voir dire of the court members in the light of the pretrial materials submitted to us and we are satisfied that none of the court members had formed unalterable opinions about Lieutenant Calley's guilt from the publicity to which they had been exposed and that the total impact of that publicity does not oppose the individual declaration by each member retained on the court that he could, fairly and impartially, decide whether Lieutenant Calley was guilty of any crime upon the evidence presented in open court. Irvin v Dowd, supra; Reynolds v United States, 98 US 145, 146 (1879). We conclude that this assignment of error has no merit.

In his second assignment of error the accused contends that the evidence is insufficient to establish his guilt beyond a reasonable doubt. Summarized, the pertinent evidence is as follows:

Lieutenant Calley was a platoon leader in C Company, a unit that was part of an organization known as Task Force Barker, whose mission was to subdue and drive out the enemy in an area in the Republic of Vietnam known popularly as Pinkville. Before March 16, 1968, this area, which included the village of My Lai 4, was a Viet Cong stronghold. C Company had operated in the area several times. Each time the unit had entered the area it suffered casualties by sniper fire, machine gun fire, mines, and other forms of attack. Lieutenant Calley had accompanied his platoon on some of the incursions.

On March 15, 1968, a memorial service for members of the company killed in the area during the preceding weeks was held. After the service Captain Ernest L. Medina, the commanding officer of C Company, briefed the company on a mission in the Pinkville area set for the next day. C Company was to serve as the main attack formation for Task. Force Barker. In that role it would assault and neutralize My Lai 4, 5, and 6 and then mass for an assault on My Lai 1. Intelligence reports indicated that the unit would be opposed by a veteran enemy battalion, and that all civilians would be absent from the area. The objective was to destroy the enemy. Disagreement exists as to the instructions on the specifics of destruction.

Captain Medina testified that he instructed his troops that they were to destroy My Lai 4 by "burning the hootches, to kill the livestock, to close the wells and to destroy the food crops." Asked if women and children were to be killed, Medina said he replied in the negative, adding that, "You must use common sense. If they have a weapon and are trying to engage you, then you can shoot back, but you must use common sense." However, Lieutenant Calley testified that Captain Medina informed the troops they were to kill every living thing—men, women, children, and animals—and under no circumstances were they to leave any Vietnamese behind them as they passed through the villages enroute to their final objective. Other witnesses gave more or less support to both versions of the briefing.

On March 16, 1968, the operation began with interdicting fire. C Company was then brought to the area by helicopters. Lieutenant Calley's platoon was on the first lift. This platoon formed a defense perimeter until the remainder of the force was landed. The unit received no hostile fire from the village.

Calley's platoon passed the approaches to the village with his men firing heavily. Entering the village, the platoon encountered only unarmed, unresisting men, women, and children. The villagers, including infants held in their mothers' arms, were assembled and moved in separate groups to collection points. Cal-

ley testified that during this time he was radioed twice by Captain Medina, who demanded to know what was delaying the platoon. On being told that a large number of villagers had been detained, Calley said Medina ordered him to "waste them." Calley further testified that he obeyed the orders because he had been taught the doctrine of obedience throughout his military career. Medina denied that he gave any such order.

One of the collection points for the villagers was in the southern part of the village. There, Private First Class Paul D. Meadlo guarded a group of between 30 to 40 old men, women, and children. Lieutenant Calley approached Meadlo and told him, " 'You know what to do,' " and left. He returned shortly and asked Meadlo why the people were not yet dead. Meadlo replied he did not know that Calley had meant that they should be killed. Calley declared that he wanted them dead. He and Meadlo then opened fire on the group, until all but a few children fell. Calley then personally shot these children. He expended 4 or 5 magazines from his M-16 rifle in the incident.

Lieutenant Calley and Meadlo moved from this point to an irrigation ditch on the east side of My Lai 4. There, they encountered another group of civilians being held by several soldiers. Meadlo estimated that this group contained from 75 to 100 persons. Calley stated, " 'We got another job to do, Meadlo,' " and he ordered the group into the ditch. When all were in the ditch, Calley and Meadlo opened fire on them. Although ordered by Calley to shoot, Private First Class James J. Dursi refused to join in the killings, and Specialist Four Robert E. Maples refused to give his machine gun to Calley for use in the killings. Lieutenant Calley admitted that he fired into the ditch, with the muzzle of his weapon within 5 feet of people in it. He expended between 10 to 15 magazines of ammunition on this occasion.

With his radio operator, Private Charles Sledge, Calley moved to the north end of the ditch. There, he found an elderly Vietnamese monk, whom he interrogated. Calley struck the man with his rifle butt and then shot him in the head. Other testimony indicates that immediately afterwards a young child was observed running toward the village. Calley seized him by the arm, threw him into the ditch, and fired at him. Calley admitted interrogating and striking the monk, but denied shooting him. He also denied the incident involving the child.

Appellate defense counsel contend that the evidence is insufficient to establish the accused's guilt. They do not dispute Calley's participation in the homicides, but they argue that he did not act with the malice or *mens rea* essential to a conviction of murder; that the orders he received to kill everyone in the village were not palpably illegal; that he was acting in ignorance of the laws of war; that since he was told that only "the enemy" would be in the village, his honest belief that there were no innocent civilians in the village exonerates him of criminal responsibility for their deaths; and, finally, that his actions were in the heat of passion caused by reasonable provocation.

■ In assessing the sufficiency of the evidence to support findings of guilty, we cannot reevaluate the credibility of the witnesses or resolve conflicts in their testimony and thus decide anew whether the accused's guilt was established beyond a reasonable doubt. Our function is more limited; it is to determine whether the record contains enough evidence for the triers of the facts to find beyond a reasonable doubt each element of the offenses involved. United States v Papenheim, 19 USCMA 203, 41 CMR 203 (1970); United States v Wilson, 13 USCMA 670, 33 CMR 202 (1963).

■ The testimony of Meadlo and others provided the court members with ample evidence from which to find that Lieutenant Calley directed and personally participated in the intentional killing of men, women, and children, who were unarmed and in the custody of armed soldiers of C Company. If the prosecution's witnesses are believed, there is also ample evidence to support a finding that the accused deliberately shot the Vietnamese monk whom he interrogated, and that he seized, threw into a ditch, and fired on a child with the intent to kill.

■ Enemy prisoners are not subject to summary execution by their captors. Military law has long held that the killing of an unresisting prisoner is murder. Winthrop's Military Law and Precedents, 2d ed., 1920 Reprint, at 788–91.

> While it is lawful to kill an enemy "in the heat and exercise of war," yet "to kill such an enemy after he has laid down his arms . . . is murder."

Digest of Opinions of the Judge Advocates General of the Army, 1912, at 1074–75 n. 3.

■ Conceding for the purposes of this assignment of error that Calley believed the villagers were part of "the enemy," the uncontradicted evidence is that they were under the control of armed soldiers and were offering no resistance. In his testimony, Calley admitted he was aware of the requirement that prisoners be treated with respect. He also admitted he knew that the normal practice was to interrogate villagers, release those who could satisfactorily account for themselves, and evacuate the suspect among them for further examination. Instead of proceeding in the usual way, Calley executed all, without regard to age, condition, or possibility of suspicion. On the evidence, the court-martial could reasonably find Calley guilty of the offenses before us.

■ At trial, Calley's principal defense was that he acted in execution of Captain Medina's order to kill everyone in My Lai 4. Appellate defense counsel urge this defense as the most important factor in assessment of the legal sufficiency of the evidence. The argument, however, is inapplicable to whether the evidence is *legally* sufficient. Captain Medina denied that he issued any such order, either during the previous day's briefing or on the date the killings were carried out. Resolution of the conflict between his testimony and that of the accused was for the triers of the facts. United States v Guerra, 13 USCMA 463, 32 CMR 403 (1963). The general findings of guilty, with exceptions as to the number of persons killed, does not indicate whether the court members found that Captain Medina did not issue the alleged order to kill, or whether, if he did, the court members believed that the accused

knew the order was illegal. For the purpose of the legal sufficiency of the evidence, the record supports the findings of guilty.

In the third assignment of error, appellate defense counsel assert gross deficiencies in the military judge's instructions to the court members. Only two assertions merit discussion. One contention is that the judge should have, but did not, advise the court members of the necessity to find the existence of "malice aforethought" in connection with the murder charges; the second allegation is that the defense of compliance with superior orders was not properly submitted to the court members.

The existence *vel non* of malice, say appellate defense counsel, is the factor that distinguishes murder from manslaughter. See United States v Judd, 10 USCMA 113, 27 CMR 187 (1959). They argue that malice is an indispensable element of murder and must be the subject of a specific instruction. In support, they rely upon language in our opinion in United States v Roman, 1 USCMA 244, 2 CMR 150 (1952).

■ *Roman* involved a conviction of murder under Article of War 92, which provided for punishment of any person subject to military law "found guilty of murder." As murder was not further defined in the Article, it was necessary to refer to the common law element of malice in the instructions to the court members in order to distinguish murder from manslaughter. United States v Roman, supra; *cf.* United States v Judd, supra. In enactment of the Uniform Code of Military Justice, Congress eliminated malice as an element of murder by codifying the common circumstances under which that state of mind was deemed to be present. Hearings on HR 2498 Before a Subcommittee of the House Armed Services Committee, 81st Cong., 1st Sess. 1246–1248 (1949); HR Rep No 491, 81st Cong, 1st Sess 3 (1949). One of the stated purposes of the Code was the "listing and definition of offenses, redrafted and rephrased in modern legislative language." S Rep No 486, 81st Cong, 1st Sess 2 (1949). That purpose was accomplished by defining murder as the unlawful killing of a human

being, without justification or excuse. Article 118, Uniform Code of Military Justice, 10 USC § 918. Article 118 also provides that murder is committed if the person, intending to kill or inflict grievous bodily harm, was engaged in an inherently dangerous act, or was engaged in the perpetration or attempted perpetration of certain felonies. In each of these instances before enactment of the Uniform Code, malice was deemed to exist and the homicide was murder. The Code language made it unnecessary that the court members be instructed in the earlier terminology of "malice aforethought." Now, the conditions and states of mind that must be the subject of instructions have been declared by Congress; they do not require reference to malice itself. *Cf.* United States v Craig, 2 USCMA 650, 10 CMR 148 (1953).

■ The trial judge delineated the elements of premeditated murder for the court members in accordance with the statutory language. He instructed them that to convict Lieutenant Calley, they must be convinced beyond a reasonable doubt that the victims were dead; that their respective deaths resulted from specified acts of the accused; that the killings were unlawful; and that Calley acted with a premeditated design to kill. The judge defined accurately the meaning of an unlawful killing and the meaning of a "premeditated design to kill." These instructions comported fully with requirements of existing law for the offense of premeditated murder, and neither statute nor judicial precedent requires that reference also be made to the pre-Code concept of malice.

We turn to the contention that the judge erred in his submission of the defense of superior orders to the court. After fairly summarizing the evidence, the judge gave the following instructions pertinent to the issue:

> The killing of resisting or fleeing enemy forces is generally recognized as a justifiable act of war, and you may consider any such killings justifiable in this case. The law attempts to protect those persons not actually engaged in warfare, however; and limits the circumstances under which their lives may be taken.

> Both combatants captured by and noncombatants detained by the opposing force, regardless of their loyalties, political views, or prior acts, have the right to be treated as prisoners until released, confined, or executed, in accordance with law and established procedures, by competent authority sitting in judgment of such detained or captured individuals. Summary execution of detainees or prisoners is forbidden by law. Further, it's clear under the evidence presented in this case, that hostile acts or support of the enemy North Vietnamese or Viet Cong forces by inhabitants of My Lai (4) at some time prior to 16 March 1968, would not justify the summary execution of all or a part of the occupants of My Lai (4) on 16 March, nor would hostile acts committed that day, if, following the hostility, the belligerents surrendered or were captured by our forces. I therefore instruct you, as a matter of law, that if unresisting human beings were killed at My Lai (4) while within the effective custody and control of our military forces, their deaths cannot be considered justified, and any order to kill such people would be, as a matter of law, an illegal order. Thus, if you find that Lieutenant Calley received an order directing him to kill unresisting Vietnamese within his control or within the control of his troops, *that order would be an illegal order.*

A determination that an order is illegal does not, of itself, assign criminal responsibility to the person following the order for acts done in compliance with it. Soldiers are taught to follow orders, and special attention is given to obedience of orders on the battlefield. Military effectiveness depends upon obedience to orders. On the other hand, the obedience of a soldier is not the obedience of an automaton. A soldier is a reasoning agent, obliged to respond, not as a machine, but as a person. The law takes these factors into account in assessing criminal re-

sponsibility for acts done in compliance with illegal orders.

The acts of a subordinate done in compliance with an unlawful order given him by his superior are excused and impose no criminal liability upon him unless the superior's order is one which a man of *ordinary sense and understanding* would, under the circumstances, know to be unlawful, or if the order in question is actually known to the accused to be unlawful.

. . . . .

. . . In determining what orders, if any, Lieutenant Calley acted under, if you find him to have acted, you should consider all of the matters which he has testified reached him and which you can infer from other evidence that he saw and heard. Then, unless you find beyond a reasonable doubt that he was not acting under orders directing him in substance and effect to kill unresisting occupants of My Lai (4), you must determine whether Lieutenant Calley actually knew those orders to be unlawful.

. . . In determining whether or not Lieutenant Calley had knowledge of the unlawfulness of any order found by you to have been given, you may consider all relevant facts and circumstances, including Lieutenant Calley's rank; educational background; OCS schooling; other training while in the Army, including basic training, and his training in Hawaii and Vietnam; his experience on prior operations involving contact with hostile and friendly Vietnamese; his age; and any other evidence tending to prove or disprove that on 16 March 1968, Lieutenant Calley knew the order was unlawful. If you find beyond a reasonable doubt, on the basis of all the evidence, that *Lieutenant Calley actually knew* the order under which he asserts he operated was unlawful, the fact that the order was given operates as no defense.

Unless you find beyond reasonable doubt that the accused acted with actual knowledge that the order was unlawful, you must proceed to deter-

mine whether, under the circumstances, *a man of ordinary sense and understanding would have known the order was unlawful. Your deliberations on this question do not focus on Lieutenant Calley and the manner in which he perceived the legality of the order found to have been given him. The standard is that of a man of ordinary sense and understanding under the circumstances.*

Think back to the events of 15 and 16 March 1968. . . . Then determine, in light of all the surrounding circumstances, whether the order, which to reach this point you will have found him to. be operating in accordance with, is one which a man of ordinary sense and understanding would know to be unlawful. Apply this to each charged act which you have found Lieutenant Calley to have committed. Unless you are satisfied from the evidence, beyond a reasonable doubt, that a man of ordinary sense and understanding would have known the order to be unlawful, you must acquit Lieutenant Calley for committing acts done in accordance with the order. (Emphasis added.)

Appellate defense counsel contend that these instructions are prejudicially erroneous in that they require the court members to determine that Lieutenant Calley knew that an order to kill human beings in the circumstances under which he killed was illegal by the standard of whether "a man of ordinary sense and understanding" would know the order was illegal. They urge us to adopt as the governing test whether the order is so palpably or manifestly illegal that a person of "the commonest understanding" would be aware of its illegality. They maintain the standard stated by the judge is too strict and unjust; that it confronts members of the armed forces who are not persons of ordinary sense and understanding with the dilemma of choosing between the penalty of death for disobedience of an order in time of war on the one hand and the equally serious punishment for obedience on the other. Some thoughtful commentators on

military law have presented much the same argument.[1]

The "ordinary sense and understanding" standard is set forth in the present Manual for Courts-Martial, United States, 1969 (Rev) and was the standard accepted by this Court in United States v Schultz, 18 USCMA 133, 39 CMR 133 (1969) and United States v Keenan, 18 USCMA 108, 39 CMR 108 (1969). It appeared as early as 1917. Manual for Courts-Martial, U. S. Army, 1917, paragraph 442. Apparently, it originated in a quotation from F. Wharton, Homicide § 485 (3d ed. 1907). Wharton's authority is Riggs v State, 3 Coldwell 85, 91 American Decisions 272, 273 (Tenn 1866), in which the court approved a charge to the jury as follows:

"[I]n its substance being clearly illegal, so that a man of ordinary sense and understanding would know as soon as he heard the order read or given that such order was illegal, would afford a private no protection for a crime committed under such order."

Other courts have used other language to define the substance of the defense. Typical is McCall v McDowell, 15 F Cas 1235, 1240 (CCD Cal 1867), in which the court said:

But I am not satisfied that Douglas ought to be held liable to the plaintiff at all. He acted not as a volunteer, but as a subordinate in obedience to the order of his superior. Except in a plain case of excess of authority, where at first blush it is apparent and palpable to the commonest understanding that the order is illegal, I cannot but think that the law should excuse the military subordinate when acting in obedience to the orders of his commander. Otherwise he is placed in the dangerous dilemma of being liable in damages to third persons for obedience to an order, or to the loss of his commis-

sion and disgrace for disobedience thereto. . . . The first duty of a soldier is obedience, and without this there can be neither discipline nor efficiency in an army. If every subordinate officer and soldier were at liberty to question the legality of the orders of the commander, and obey them or not as they may consider them valid or invalid, the camp would be turned into a debating school, where the precious moment for action would be wasted in wordy conflicts between the advocates of conflicting opinions.

Colonel William Winthrop, the leading American commentator on military law, notes:

But for the inferior to assume to determine the question of the lawfulness of an order given him by a superior would of itself, as a general rule, amount to insubordination, and such an assumption carried into practice would subvert military discipline. Where the order is apparently regular and *lawful on its face,* he is not to go behind it to satisfy himself that his superior has proceeded with authority, but is to obey it according to its terms, *the only exceptions recognized to the rule of obedience being cases of orders so manifestly beyond the legal power or discretion of the commander as to admit of no rational doubt of their unlawfulness . . . .*

Except in such instances of palpable illegality, which must be of rare occurrence, the inferior should presume that the order was lawful and authorized and obey it accordingly, and in obeying it can scarcely fail to be held justified by a military court.

Winthrop's Military Law and Precedents, 2d ed., 1920 Reprint, at 296–297 (footnotes omitted)(emphasis added).

In the stress of combat, a member of

---

[1] In the words of one author: "If the standard of reasonableness continues to be applied, we run the unacceptable risk of applying serious punishment to one whose only crime is the slowness of his wit or his stupidity. The soldier, who honestly believes that he must obey an order to kill and is punished for it, is convicted not of murder but of simple negligence." Finkelstein, Duty to Obey as a Defense, March 9, 1970 (unpublished essay, Army War College). See also L. Norene, Obedience to Orders as a Defense to a Criminal Act, March 1971 (unpublished thesis presented to The Judge Advocate General's School, U. S. Army).

the armed forces cannot reasonably be expected to make a refined legal judgment and be held criminally responsible if he guesses wrong on a question as to which there may be considerable disagreement. But there is no disagreement as to the illegality of the order to kill in this case. For 100 years, it has been a settled rule of American law that even in war the summary killing of an enemy, who has submitted to, and is under, effective physical control, is murder. Appellate defense counsel acknowledge that rule of law and its continued viability, but they say that Lieutenant Calley should not be held accountable for the men, women and children he killed because the court-martial could have found that he was a person of "commonest understanding" and such a person might not know what our law provides; that his captain had ordered him to kill these unarmed and submissive people and he only carried out that order as a good disciplined soldier should.

 Whether Lieutenant Calley was the most ignorant person in the United States Army in Vietnam, or the most intelligent, he must be presumed to know that he could not kill the people involved here. The United States Supreme Court has pointed out that "[t]he rule that 'ignorance of the law will not excuse' [a positive act that constitutes a crime] . . . is deep in our law." Lambert v California, 355 US 225, 228 (1957). An order to kill infants and unarmed civilians who were so demonstrably incapable of resistance to the armed might of a military force as were those killed by Lieutenant Calley is, in my opinion, so palpably illegal that whatever conceptional difference there may be between a person of "commonest understanding" and a person of "common understanding," that difference could not have had any "impact on a court of lay members receiving the respective wordings in instructions," as appellate defense counsel contend. In my judgment, there is no possibility of prejudice to Lieutenant Calley in the trial judge's reliance upon the established standard of excuse of criminal conduct, rather than the standard of "commonest understanding" presented by the defense, or by the new variable test postulated in the dissent,

which, with the inclusion of such factors for consideration as grade and experience, would appear to exact a higher standard of understanding from Lieutenant Calley than that of the person of ordinary understanding.

In summary, as reflected in the record, the judge was capable and fair, and dedicated to assuring the accused a trial on the merits as provided by law; his instructions on all issues were comprehensive and correct. Lieutenant Calley was given every consideration to which he was entitled, and perhaps more. We are impressed with the absence of bias or prejudice on the part of the court members. They were instructed to determine the *truth* according to the law and this they did with due deliberation and full consideration of the evidence. Their findings of guilty represent the truth of the facts as they determined them to be and there is substantial evidence to support those findings. No mistakes of procedure cast doubt upon them.

Consequently, the decision of the Court of Military Review is affirmed.

DUNCAN, Judge (concurring in the result):

My difference of opinion from Judge Quinn's view of the defense of obedience to orders is narrow. The issue of obedience to orders was raised in defense by the evidence. Contrary to Judge Quinn, I do not consider that a presumption arose that the appellant knew he could not kill the people involved. The Government, as I see it, is not entitled to a presumption of what the appellant knew of the illegality of an order. It is a matter for the factfinders under proper instructions.

Paragraph 216, Manual for Courts-Martial, United States, 1969 (Rev), provides for special defenses: excuse because of accident or misadventure; self-defense; entrapment; coercion or duress; physical or financial inability; and obedience to apparently lawful orders. Subparagraph *d* of paragraph 216 is as follows:

An order requiring the performance of a military duty may be inferred to be legal. An act performed manifestly beyond the scope of authority, or pursuant to an order that a man of ordi-

nary sense and understanding would know to be illegal, or in a wanton manner in the discharge of a lawful duty, is not excusable.

The military judge clearly instructed the members pursuant to this provision of the Manual. The heart of the issue is whether, under the circumstances of this case, he should have abandoned the Manual standard and fashioned another. The defense urges a purely subjective standard; the dissent herein yet another. I suggest that there are important general as well as certain specific considerations which convince me that the standard should not be abandoned. The process of promulgating Manual provisions is geared to produce requirements for the system only after most serious reflection by knowledgeable and concerned personnel. [2] These persons have full regard for the needs of the armed forces and genuine concern for the plight of one accused. Those who prepared the Manual provision and the President of the United States, the Commander-in-Chief, who approved and made the provision a part of our law,[3] were aware that disobedience to orders is the anathema to an efficient military force. Judge Quinn points out that this Court has established as precedent the applicability of the special defense upon proof adduced pursuant to the Manual standard. These are important general reasons for not aborting a standard that has been long in existence and often used.

It is urged that in using the Manual test of "a man of ordinary sense and understanding" those persons at the lowest end of the scale of intelligence and experience in the services may suffer conviction while those more intelligent and experienced would possess faculties which would cause them to abjure the order with impunity. Such an argument has some attraction but in my view falls short of that which should impel a court to replace that which is provided to us as law.

It appears to me that all tests which measure an accused's conduct by an objective standard—whether it is the test of "palpable illegality to the commonest understanding" or whether the test establishes a set of profile considerations by which to measure the accused's ability to assess the legality of the order— are less than perfect, and they have a certain potential for injustice to the member having the slowest wit and quickest obedience. Obviously the higher the standard, the likelihood is that fewer persons will be able to measure up to it. Knowledge of the fact that there are other standards that are arguably more fair does not convince me that the standard used herein is unfair, on its face, or as applied to Lieutenant Calley.

Perhaps a new standard, such as the dissent suggests, has merit; however, I would leave that for the legislative authority or for the cause where the record demonstrates harm from the instructions given. I perceive none in this case. The general verdict in this case implies that the jury believed a man of ordinary sense and understanding would have known the order in question to be illegal.[4] Even conceding arguendo that this issue should have been resolved under instructions requiring a finding that almost every member of the armed forces would have immediately recognized that the order was unlawful, as well as a finding that as a consequence of his age, grade, intelligence, experience, and training, Lieutenant Calley should have recognized the order's illegality, I do not believe the result in this case would have been different.

---

[2] The draft of the Manual for Courts-Martial, United States, 1951, its predecessor, was prepared through the cooperation of the Judge Advocates General of the Army, Navy, Air Force, and the General Counsel, Office of the Secretary of Defense. The draft was then approved by the Secretary of Defense. The draft was further reviewed by the Office of the Attorney General and the Director of the Archives. After study by the Executive Office of the President, it was promulgated as Executive Order 10214 on February 8, 1951. See Legal and Legislative Basis, MCM, 1951.

[3] See Article 36, UCMJ, 10 USC § 836; United States v Smith, 13 USCMA 105, 32 CMR 105 (1962).

[4] This assumes that the jury found that the order the appellant contends he obeyed was given.

I believe the trial judge to have been correct in his denial of the motion to dismiss the charges for the reason that pretrial publicity made it impossible for the Government to accord the accused a fair trial.

Both the principal opinion and the analysis of the Court of Military Review state that in the enactment of the Uniform Code of Military Justice Congress has, in effect, codified the requirement of malice aforethought by defining murder as the unlawful killing of a human being, without justification or excuse. Article 118, UCMJ, 10 USC § 918. It should also be noted that in the case at bar the members of the panel were charged that a finding that the homicides were without justification or excuse was necessary to convict for premeditated murder. Furthermore, I cannot say that the evidence lacks sufficiency to convict in respect to any of the charges.

DARDEN, Chief Judge (dissenting):

Although the charge the military judge gave on the defense of superior orders was not inconsistent with the Manual treatment of this subject, I believe the Manual provision is too strict in a combat environment.[5] Among other things, this standard permits serious punishment of persons whose training and attitude incline them either to be enthusiastic about compliance with orders or not to challenge the authority of their superiors. The standard also permits conviction of members who are not persons of ordinary sense and understanding.

The principal opinion has accurately traced the history of the current standard. Since this Manual provision is one of substantive law rather than one relating to procedure or modes of proof, the Manual rule is not binding on this Court, which has the responsibility for determining the principles that govern justification in the law of homicide. United States v Smith, 13 USCMA 105, 32 CMR 105 (1962). My impression is that the weight of authority, including the commentators whose articles are mentioned in the principal opinion, supports a more liberal approach to the defense of superior orders. Under this approach, superior orders should constitute a defense except "in a plain case of excess of authority, where at first blush it is apparent and palpable to the commonest understanding that the order is illegal." McCall v McDowell, 15 F Cas 1235, 1240 (No. 8,673) (CCD Cal 1867); In re Fair, 100 F 149, 155 (CCD Neb 1900); Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, at 296–97.

While this test is phrased in language that now seems "somewhat archaic and ungrammatical,"[6] the test recognizes that the essential ingredient of discipline in any armed force is obedience to orders and that this obedience is so important it should not be penalized unless the order would be recognized as illegal, not by what some hypothetical reasonable soldier would have known, but also by "those persons at the lowest end of the scale of intelligence and experience in the services."[7] This is the real purpose in permitting superior orders to be a defense, and it ought not to be restricted by the concept of a fictional reasonable man so that, regardless of his personal characteristics, an accused judged after the fact may find himself punished for either obedience or disobedience, depending on whether the evidence will support the finding of simple negligence on his part.

It is true that the standard of a "reasonable man" is used in other areas of military criminal law, e.g., in connection with the provocation necessary to reduce murder to voluntary manslaughter; what constitutes an honest and reasonable mistake; and, indirectly, in connection with involuntary manslaughter. But in none of these instances do we have the countervailing consideration of avoiding the subversion of obedience to discipline in combat by encouraging a member to

---

[5] I agree with the majority opinion that the military judge was eminently fair and I do not blame him for this error.

[6] L. Norene, Obedience to Orders as a Defense to a Criminal Act, March 1971 (unpublished thesis presented to The Judge Advocate General's School, U. S. Army).

[7] Id.

weigh the legality of an order or whether the superior had the authority to issue it. See Martin v Mott, 25 US 19, 30 (1827).

The preservation of human life is, of course, of surpassing importance. To accomplish such preservation, members of the armed forces must be held to standards of conduct that will permit punishment of atrocities and enable this nation to follow civilized concepts of warfare. In defending the current standard, the Army Court of Military Review expressed the view that:

> Heed must be given not only to the subjective innocence-through-ignorance in the soldier, but to the consequences for his victims. Also, barbarism tends to invite reprisal to the detriment of our own force or disrepute which interferes with the achievement of war aims, even though the barbaric acts were preceded by orders for their commission. Casting the defense of obedience to orders solely in subjective terms of *mens rea* would operate practically to abrogate those objective restraints which are essential to functioning rules of war.

United States v Calley, 46 CMR 1131, 1184 (ACMR 1973).

I do not disagree with these comments. But while humanitarian considerations compel us to consider the impact of actions by members of our armed forces on citizens of other nations, I am also convinced that the phrasing of the defense of superior orders should have as its principal objective fairness to the unsophisticated soldier and those of somewhat limited intellect who nonetheless are doing their best to perform their duty.

The test of palpable illegality to the commonest understanding properly balances punishment for the obedience of an obviously illegal order against protection to an accused for following his elementary duty of obeying his superiors. Such a test reinforces the need for obedience as an essential element of military discipline by broadly protecting the soldier who has been effectively trained to look to his superiors for direction. It also promotes fairness by permitting the military jury to consider the particular accused's intelligence, grade, training, and other elements directly related to the issue of whether he should have known an order was illegal. Finally, that test imputes such knowledge to an accused not as a result of simple negligence but on the much stronger circumstantial concept that almost anyone in the armed forces would have immediately recognized that the order was palpably illegal.

I would adopt this standard as the correct instruction for the jury when the defense of superior orders is in issue. Because the original case language is archaic and somewhat ungrammatical, I would rephrase it to require that the military jury be instructed that, despite his asserted defense of superior orders, an accused may be held criminally accountable for his acts, allegedly committed pursuant to such orders, if the court members are convinced beyond a reasonable doubt (1) that almost every member of the armed forces would have immediately recognized that the order was unlawful, and (2) that the accused should have recognized the order's illegality as a consequence of his age, grade, intelligence, experience, and training.

The temptation is to say that even under this new formulation Lieutenant Calley would have been found guilty. No matter how such a position is phrased, essentially it means that the appellate judge rather than the military jury is functioning as a fact finder. My reaction to this has been expressed by the former chief justice of the California Supreme Court in these words:

> If an erroneous instruction or an erroneous failure to give an instruction relates to a substantial element of the appellant's case, an appellate court would not find it highly probable that the error did not influence the verdict.

R. Traynor, The Riddle of Harmless Error 74 (1970).

The same authority also expressed this thought:

> The concept of fairness extends to reconsideration of the merits when a judgment has been or might have been influenced by error. In that event

there should be a retrial in the trial court, time consuming or costly though it may be. The short-cut alternative of reconsidering the merits in the appellate court, because it is familiar with the evidence and aware of the error, has the appeal of saving time and money. Unfortunately it does not measure up to accepted standards of fairness.

*Id.* at 20.

In the · instant case, Lieutenant Calley's testimony placed the defense of superior orders in issue, even though he conceded that he knew prisoners were normally to be treated with respect and that the unit's normal practice was to interrogate Vietnamese villagers, release those who could account for themselves, and evacuate those suspected of being a part of the enemy forces. Although crucial parts of his testimony were sharply contested, according to Lieutenant Calley, (1) he had received a briefing before the assault in which he was instructed that every living thing in the village was to be killed, including women and children; (2) he was informed that speed was important in securing the village and moving forward; (3) he was ordered that under no circumstances were any Vietnamese to be allowed to stay behind the lines of his forces; (4) the residents of the village who were taken into custody were hindering the progress of his platoon in taking up the position it was to occupy; and (5) when he informed Captain Medina of this hindrance, he was ordered to kill the villagers and to move his platoon to a proper position.

In addition to the briefing, Lieutenant Calley's experience in the Pinkville area caused him to know that, in the past, when villagers had been left behind his unit, the unit had immediately received sniper fire from the rear as it pressed forward. Faulty intelligence apparently led him also to believe that those persons in the village were not innocent civilians but were either enemies or enemy sympathizers. For a participant in the My Lai operation, the circumstances that could have obtained there may have caused the illegality of alleged orders to kill civilians to be much less clear than they are in a hindsight review.[8]

Since the defense of superior orders was not submitted to the military jury under what I consider to be the proper standard, I would grant Lieutenant Calley a rehearing.

I concur in Judge Quinn's opinion on the other granted issues.

---

[8] A New York Times Book Reviewer has noted, "One cannot locate the exact moment in his [Calley's] narrative when one can be absolutely certain that one would have acted differently given the same circumstances." See Paris ed., New York Herald Tribune, September 13, 1971.