UNITED STATES, Appellee

v.

Michael J. SMITH, Sergeant
U.S. Army, Appellant

No. 09-0169

Crim. App. No. 20060541

United States Court of Appeals for the Armed Forces

Argued October 8, 2009

Decided February 4, 2010

BAKER, J., delivered the opinion of the Court, in which ERDMANN, STUCKY, and RYAN, JJ., joined.  EFFRON, C.J., filed a separate opinion concurring in part and in the result.


Counsel

For Appellant:  Lieutenant Colonel Jonathan F. Potter (argued); Colonel Mark Tellitocci, Major Grace M. Gallagher, and Captain Alison L. Gregoire (on brief).

For Appellee:  Major Karen J. Borgerding (argued); Colonel Norman F. J. Allen III, Lieutenant Colonel Francis C. Kiley, and Major Lisa L. Gumbs (on brief); Lieutenant Colonel Martha L. Foss and Captain Michael G. Ponds.

Military Judges:  Paul H. McConnell and John W. Rolph


THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

Judge BAKER delivered the opinion of the Court.

A general court-martial composed of members convicted Appellant, contrary to his pleas, of conspiracy to maltreat prisoners, in violation of Article 81, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 881 (2000), two specifications of maltreatment, in violation of Article 93, UCMJ, 10 U.S.C. § 893 (2000), dereliction of duty, in violation of Article 92, UCMJ, 10 U.S.C. § 892 (2000), and indecent acts, in violation of Article 134, UCMJ, 10 U.S.C. § 934 (2000). The members sentenced Appellant to a bad-conduct discharge, confinement for 179 days, reduction to the grade of E-1, and forfeiture of $750 pay per month for three months. The convening authority approved the findings, but approved a sentence that included confinement for three months, a bad-conduct discharge, reduction to E-2, and forfeiture of $750 pay per month for three months. On review, the United States Army Court of Criminal Appeals dismissed the specifications alleging indecent acts and dereliction of duty, affirming the remaining findings and the sentence. United States v. Smith, No. ARMY 20060541 (A. Ct. Crim. App. Oct. 27, 2008).

On Appellant's petition, we granted review of the following issues:

    I.   WHETHER THE MILITARY JUDGE ERRED BY FAILING TO INSTRUCT ON OBEDIENCE TO LAWFUL ORDERS AS IT PERTAINED TO MALTREATMENT BY HAVING A MILITARY

WORKING DOG (MWD) BARK AT A DETAINEE WHEN THERE WAS NO EVIDENCE BEFORE THE MILITARY JUDGE THAT SUCH AN ORDER WAS ILLEGAL.

II.  WHETHER THE MILITARY JUDGE ERRED WHEN HE DID NOT INSTRUCT THE PANEL ON OBEDIENCE TO ORDERS (LAWFUL OR UNLAWFUL) AS IT PERTAINED TO MALTREATMENT BY HAVING A MWD BARK AT JUVENILE DETAINEES.

III. WHETHER THE EVIDENCE FOR ALL MALTREATMENT SPECIFICATIONS WAS LEGALLY INSUFFICIENT, BECAUSE THE DETAINEES WERE NOT "SUBJECT TO [APPELLANT'S] ORDERS" AND DID NOT HAVE A "DUTY TO OBEY."

For the reasons set forth below, we conclude that the military judge did not err and the evidence was legally sufficient.

BACKGROUND

Appellant was a military working dog (MWD) handler at the Baghdad Central Confinement Facility at Abu Ghraib, Iraq. Prior to deployment, Appellant was certified as a dog handler at the Military Working Dog Handler Course, located at Lackland Air Force Base. As part of the dog handler course, Appellant was instructed on proper use of his MWD. Sergeant First Class (SFC) Hathaway, the course chief, testified that the training received at Lackland included how to manage a dog safely, including keeping the dog fifteen feet away from people or dogs and, if that is not possible, keeping the dog muzzled. At Abu Ghraib, the military working dogs were used primarily as a show of force: to deter detainees from attempting to escape or riot. However, Colonel (COL) Pappas, commander of the 205th MI Brigade

in Iraq, testified he authorized the use of MWDs in conjunction with one interrogation during December 2003.

Appellant and his working dog participated in the interrogation of detainee Ashraf Abdullah Al-Juhayshi. Testimony indicated that during this interrogation Appellant allowed his unmuzzled MWD to bark in Mr. Al-Juhayshi's face and to pull a sandbag off his head with its teeth. On January 13, 2004, Appellant was seen by Sergeant (SGT) Ketzer with his unmuzzled, barking MWD in the doorway of the cell of two juvenile detainees. The detainees screamed with fear, and Appellant was overheard saying shortly thereafter: "my buddy and I are having a contest to see if we can get [detainees] to shit themselves because we already had some piss themselves."

In response to these two incidents, Appellant was charged with maltreatment and conspiracy to maltreat.[1] Before trial, the

---

[1] Specification 3 of Charge 1 states:

> In that Sergeant Michael J. Smith, U.S. Army, at or near Baghdad Central Correctional Facility, Abu Ghraib, Iraq, between or on about 29 December 2003 and on or about 3 January 2004, did maltreat Mr. Ashraf Abdullah Al-Juhayshi, a person subject to his orders, by harassing and threatening Mr. Al-Juhayshi with his unmuzzled barking and growling military working dog.

Specification 5 of Charge 1 states: "In that Sergeant Michael J. Smith, U.S. Army, at or near Baghdad Central Correctional Facility, Abu Ghraib, Iraq, on or about 13 January 2004, did maltreat two juvenile detainees, persons subject to his orders, by harassing and threatening them with his unmuzzled barking and growling military working dog."

4

defense filed a motion to dismiss the maltreatment specifications for failure to state an offense. The military judge denied this motion and later, after the Government's case on the merits, denied a motion for a finding of not guilty for lack of sufficient evidence under Rule for Courts-Martial (R.C.M.) 917. At the close of the evidence, the military judge gave an agreed upon, albeit complex set of instructions to the panel members. Regarding Specification 3 of Charge I, where Appellant was charged with the maltreatment of Mr. Al-Juhayshi, the military judge instructed that, "An order to use military working dogs to aid in military interrogations, if you find such an order was given, would be an unlawful order."[2] Regarding

Specification 1 of Charge 2 states:

> In that Sergeant Michael J. Smith, U.S. Army, did, at or near Baghdad Central Correctional Facility, Abu Ghraib, Iraq, between on or about 15 November 2003 and on or about 15 January 2004, conspire with Sergeant Santos Cardona, to commit an offense under the Uniform Code of Military Justice, to wit: maltreatment of subordinate detainees, and in order to effect the object of the conspiracy the said Sergeant Smith directed, encouraged, or permitted his unmuzzled military working dog to bark and growl at detainees in order to make the detainees urinate or defecate on themselves.

[2] The parties do not agree on what, if anything, Appellant was ordered to do with his MWD. They do agree that the record does not reflect what if anything he was ordered to do and indeed the military judge properly put to the members the factual question as to whether an order was given. In our view, the military judge's descriptor "use of military working dogs to aid in military interrogations" encompassed any possible "order" as argued by Appellant at trial.

United States v. Smith, No. 09-0169/AR

Specification 5 of Charge I, the maltreatment of the juvenile detainees, the military judge did not instruct on obedience to orders, lawful or otherwise.

ANALYSIS

Issue I: Failure to Instruct on Obedience to Lawful Orders

"'The question of whether a jury was properly instructed [is] a question of law, and thus, review is de novo.'" United States v. McDonald, 57 M.J. 18, 20 (C.A.A.F. 2002) (alteration added in McDonald) (quoting United States v. Maxwell, 45 M.J. 406, 424 (C.A.A.F. 1996)). "Obedience to lawful orders" is an affirmative defense on which the military judge has a sua sponte duty to instruct if the defense is reasonably raised. See United States v. Davis, 53 M.J. 202, 205 (C.A.A.F. 2000); R.C.M. 916(d); R.C.M. 920(e)(3).

Specifically, "[i]t is a defense to any offense that the accused was acting pursuant to orders unless the accused knew the orders to be unlawful or a person of ordinary sense and understanding would have known the orders to be unlawful." R.C.M. 916(d). The prosecution bears the burden of proving beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b). "The test whether an affirmative defense is reasonably raised is whether the record contains some evidence to which the court members may attach credit if they so desire." Davis, 53 M.J. at 205. "This Court reviews the question of

6

whether the military judge correctly determined that an order was lawful on a de novo basis." United States v. New, 55 M.J. 95, 106 (C.A.A.F. 2001).

> The essential attributes of a lawful order include: (1) issuance by competent authority -- a person authorized by applicable law to give such an order; (2) communication of words that express a specific mandate to do or not do a specific act; and (3) relationship of the mandate to a military duty.

United States v. Deisher, 61 M.J. 313, 317 (C.A.A.F. 2005); see also Manual for Courts-Martial, United States pt. IV, para. 14.c(2)(a) (2005 ed.) (MCM). Orders are presumed to be lawful. Deisher, 61 M.J. at 317. Additionally, Appellant contends that if he reasonably believed an order was lawful, even if in fact it was unlawful, then the members should have been instructed on the defense of lawful orders. However, some evidence must still be presented that a lawful order was given.

Appellant argues that an obedience to lawful orders instruction should have been given to the panel regarding the use of his dog against Mr. Al-Juhayshi as some evidence was presented at trial that Appellant received an order to use his working dog to aid the interrogation. Such an instruction would have informed the members that Appellant had an absolute defense to the charged conduct if he was acting pursuant to a lawful order. As Appellant acknowledges, entitlement to the instruction required some evidence that there was a lawful

7

order, or an order he might reasonably believe was lawful, given to Appellant to engage in the conduct charged. See Davis, 53 M.J. at 205. That means that in this case, some evidence would have to show that a lawful order was issued to Appellant to use his MWD in the interrogation of Mr. Al-Juhayshi in the manner in which the dog was used.

The parties stipulated that Steve Stefanowicz, a civilian contractor and interrogator at the prison, wrote in his notes that working dogs were being used during interrogations and "this program has been approved by COL Pappas and Chief [Petty Officer (Chief)] Rivas, as of 31 DEC 2003." Appellant cites this fact as evidence that he received an order to use his working dog to aid interrogation. In response, the Government points out that "this program" appears to pertain to the general use of a MWD, rather than the specific manner in which Appellant used his MWD during Mr. Al-Juhayshi's interrogation. Mr. Stefanowicz was not a witness at trial and, accordingly, no clarifying questions were asked of him.[3]

COL Pappas testified that he did not know why the interrogator's notes stated that the use of MWDs had been approved for Mr. Al-Juhayshi's interrogation because the only approved use of the dogs he remembered was for one of three

---

[3] Appellant does not allege that he was denied access to Mr. Stefanowicz as a putative defense witness or to prepare his defense.

other high-value detainees. Staff Sergeant (SSG) Fredrick, who had been the noncommissioned officer in charge of the confinement block, testified that Mr. Stefanowicz told him that the use of dogs during the Mr. Al-Juhayshi interrogation had been approved. SSG Fredrick, in turn, told Appellant to use his MWD during Mr. Al-Juhayshi's interrogation. The record does not reflect what actions SSG Fredrick authorized; neither does it indicate that SSG Fredrick directed Appellant to remove the muzzle or to allow close contact between the dog and the detainee. Thus, while there is some evidence that Appellant received an order to use his working dog in the context of Mr. Al-Juhayshi's interrogation, there is no evidence he received an order, lawful or otherwise, to remove his dog's muzzle or have his dog remove Mr. Al-Juhayshi's hood.

A lawful order instruction would have been required only if the order given had been lawful or could reasonably have been believed to be lawful. See United States v. Calley, 22 C.M.A. 534, 544, 48 C.M.R. 19, 29 (1973) (upholding the military judge's instructions that an order to shoot unarmed, detained civilians could not be believed to be lawful by "a man of ordinary sense and understanding"). In this case, if an order was given as Appellant argues it was, it did not issue from competent authority.

A competent authority is "a person authorized by applicable law to give such an order." Deisher, 61 M.J. at 317; see United States v. Wilson, 53 M.J. 327, 332-333 (C.A.A.F. 2000) (holding that a state official was not a competent authority to discharge someone from federal National Guard service). In the context of U.S. military operations in Iraq, Lieutenant General (LTG) Sanchez, CJTF-7 commander, directed that his express approval would be necessary to use MWDs for interrogations. Specifically, LTG Sanchez listed the interrogation and counter-resistance technique of using the presence of military working dogs to "exploit Arab fear of dogs while maintaining security during interrogations" as one of the techniques that "must be approved by me personally prior to use" on "enemy prisoners of war." As a result, the record reflects LTG Sanchez was the only officer within Appellant's chain of command in Iraq competent to give that order. This limitation was recognized by COL Pappas, since he sought such approval to use MWDs in an interrogation, even after an October 12, 2003, memorandum regarding the CJTF-7 policy.[4] However, there is no evidence in the record of trial

---

[4] COL Pappas testified that he thought he had the authority to approve the use of MWDs, and later discovered he was wrong and needed to seek approval from LTG Sanchez.

that this approval was sought or obtained in Mr. Al-Juhayshi's case.[5]

To the contrary, the CJTF-7 policy, both the September 14, 2003, and October 12, 2003, versions, required that MWDs be muzzled and under control of a MWD handler at all times. Part of Appellant's duty as a MWD handler was to act in compliance with MWD policies, which called for "all reasonable efforts to use all lesser means of force" and for "[h]andlers [to] be able to control their dog." Appellant's MWD was not muzzled and, although arguably under Appellant's control, came in close contact with the detainee when it removed the bag from his head.

In short, neither COL Pappas, Chief Rivas, nor SSG Fredrick were authorized to give such an order without LTG Sanchez's approval. Since neither COL Pappas nor Chief Rivas could lawfully order a subordinate to act contrary to CJTF-7 policy, it would have been unlawful for them to order Appellant to use his MWD as he did. Thus, any order in this regard issued without LTG Sanchez's authority would have been unlawful.

In summary, (1) there was no evidence introduced that an order to use dogs in the way alleged was given, and (2) such an

---

[5] Even for the other three high-value detainees for whom COL Pappas did seek approval to use MWDs, COL Pappas stated that those requests never reached LTG Sanchez and were, therefore, never approved.

order, had it been given, would have been unlawful.[6]  Therefore,
the military judge did not err by not giving an instruction on
obedience to lawful orders.

Issue II:  Instruction on Obedience to Orders

The military judge gave an instruction for obedience to
orders for several of the offenses.[7]  However, the military judge
did not provide such an instruction regarding the specification
for maltreatment of the juvenile detainees.  Appellant contends
that the military judge erred in this regard.  Here too, the
predicate question is whether some evidence was reasonably

---

[6] In the context presented, we need not reach a conclusion as to
whether LTG Sanchez, or higher officials within the chain of
command, could have issued such a lawful order.

[7] The military judge stated:

> The evidence has raised an issue of obedience to orders in
> relation to Specifications 1, 3, and 4 of Charge I;
> Specification 2 of Charge II; the sole specification under
> Charge III; and Specifications 2 and 3 of Charge IV.  An
> order to use military working dogs to aid in military
> interrogations, if you find such an order was given, would
> be an unlawful order.  Obedience to an unlawful order does
> not necessarily result in criminal responsibility of the
> person obeying the order.  The acts of the accused if done
> in obedience to an unlawful order are excused and carry no
> criminal responsibility unless the accused knew that the
> order was unlawful or unless the order was one which a
> person of ordinary common sense under the circumstances
> would know to be unlawful. . . . . [Y]ou must first decide
> whether the accused was acting under an order to use his
> military working dog to aid in military interrogations.  If
> you are convinced beyond a reasonable doubt that the
> accused was not acting under such orders, then the defense
> of obedience to orders does not exist.  If you find that
> the accused was acting under . . . orders, you must next
> decide whether the accused knew the orders to be illegal.

raised by the defense of obedience to orders, as opposed to lawful orders.

Appellant makes three arguments as to why "some evidence" exists in the record that he was ordered to use his MWD against the juvenile detainees. First, Appellant argues that the dog handlers had previously been ordered to frighten detainees with their MWDs. Thus, in Appellant's view, it follows that use of his MWD in the manner alleged was an extension of the command's effort to frighten and control detainees. However, this argument reaches too far. As recounted above, the use of MWDs in aid of interrogation, if authorized, was only authorized in the case of a certain high-value detainee. There is no evidence in the record that Appellant mistook the juvenile detainees in question for high-value detainees. Neither does the record reflect that these juvenile detainees could reasonably have been mistaken for the high-value detainee for whom COL Pappas testified he authorized the use of MWDs in aid of interrogation. Additionally, Appellant's use of his dog against the juveniles in the manner alleged went beyond the patrolling duties to which SSG Fredrick testified and the standard operating procedure (SOP) defined.

Appellant also argues that he could not have been where SGT Ketzer described without a guard allowing him access. In related manner, Appellant argues that "[his] barking MWD and the

yells from detainees were in earshot of the MP guards, who did not respond, indicating that they were fully aware of what Appellant was doing." The implication is that Appellant's conduct was condoned, if not authorized, by the command or at least his immediate chain of command. While other personnel may have acquiesced or even condoned Appellant's conduct by their actions, it does not follow that a guard opening a gate or door is equivalent to issuing an order to use a MWD to frighten detainees, nor is it "some evidence" of such an order. Moreover, SGT Ketzer testified that there was no immediate plan to interrogate the juveniles and that Appellant had the stated goal of making them defecate.

In view of the fact that Appellant's actions were neither authorized nor ordered, the military judge did not err by failing to instruct on the defense of obedience to orders.

Issue III: Legal Sufficiency of Evidence for Maltreatment

"The test for legal sufficiency of the evidence is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.'" United States v. Ober, 66 M.J. 393, 404 (C.A.A.F. 2008) (citing United States v. Turner, 25 M.J. 324, 324 (C.M.A. 1987)). This Court "review[s] de novo the question whether the evidence is legally sufficient to support a finding of guilty." Id.

Article 93, UCMJ, states:

Cruelty and maltreatment[.] Any person subject to this chapter who is guilty of cruelty toward, or oppression or maltreatment of, any person subject to his orders shall be punished as a court-martial may direct.

The elements of maltreatment as defined in the MCM are:

(1) That a certain person is subject to the orders of the accused; and

(2) That the accused was cruel toward, or oppressed, or maltreated that person.

MCM pt. IV, para. 17(b).  The dispute in this case focuses on the first element of the offense, specifically, whether the detainees were subject to Appellant's orders for the purposes of Article 93, UCMJ.

Appellant makes three arguments.  First, the detainees were not subject to his orders.  Second, as a junior MWD handler he was not competent, in any event, to issue the orders alleged. Additionally, Appellant claims that while others may have been in a position of authority over the detainees, he was not because he did not have access to detainees on his own and did not direct their daily activities.  Third, the detainees had no duty to obey his orders.  Quoting Mynda G. Ohman, Integrating Title 18 War Crimes into Title 10:  A Proposal to Amend the Uniform Code of Military Justice, 57 A.F. L. Rev. 1, 61 (2005), Appellant argues, among other things, that the detainees were

"'not required to take an oath promising to obey the lawful orders of the belligerent forces assigned to guard them.'"

Our analysis begins with the text of the article. Article 93, UCMJ, does not specifically address the context of detainees, however, it is intended to protect persons outside the U.S. military. This is evident in the juxtaposition of the first clause, which applies to "[a]ny person subject to [the UCMJ]," and the second clause, which is addressed to "any person subject to his orders." This interpretation is supported in the nonbinding explanation in the MCM. A person is subject to orders, whether "subject to the code or not," when "by reason of some duty [he is] required to obey the lawful orders of the accused." MCM pt. IV, para. 17(c)(1). It is also supported by persuasive authority found in the limited case law addressing the maltreatment of persons outside the military. In United States v. Dickey, for example, the United States Army Board of Review found that Article 93, UCMJ, extended to the accused's treatment of a Korean Service Corps member subject to the accused's orders as an employee. 20 C.M.R. 486, 489 (A.B.R. 1956). The Board of Review noted that it was "immaterial whether or not such maltreated persons be subject to the [UCMJ]." Id. The essential qualification from the victim's perspective, therefore, is whether or not the victim is subject

to the orders of the accused, not whether the victim is a member of the U.S. armed forces.

The evidence in this case reflects the following. Chief Petty Officer Kimbro, who managed three Navy dog teams for the entry control point at Abu Ghraib, testified that an SOP for military working dogs at Abu Ghraib was approved in December 2003 and provided to all dog handlers, including Appellant. Among other things, the SOP tasked Appellant to "reduce escape attempts, encourage detainee compliance, and improve the effectiveness of compound searches and inspections." The SOP indicated that detainees were subject to his orders. Under the "Use of Force" section on "Rules of Engagement," dog handlers were instructed to yell "stop" prior to any release of a MWD, with the expectation that any detainee will follow the order to stop. It is self-evident that these procedures would only be effective if detainees were subject to the orders of MWD handlers.

Additionally, SSG Fredrick testified that the detainees were subject to his and Appellant's orders in their capacity as military policemen. According to SSG Fredrick, if an MP told a detainee to do something or to stop doing something, the detainee would have to follow orders or face consequences.

Finally, in our view, the relationship between a prison guard and prisoner or guard and detainee implies that the

17

prisoners are subject to the guards' orders. See United States v. Finch, 22 C.M.R. 698, 701 (N.B.R. 1956) ("A brig prisoner, until discharged, is a member of the military service and regardless of his status . . . is not to be subjected to acts of cruelty, oppression, or maltreatment even though no physical harm ensues."). This relationship is recognized in the Third and Fourth Geneva Conventions as well.[8]

Based on this analysis, we hold that Article 93, UCMJ, applies to detainees in U.S. custody or under U.S. control, whether they are members of the U.S. armed forces or not. Further, we conclude that viewing the evidence in a light most favorable to the prosecution, a reasonable juror could have found that Mr. Al-Juhayshi and the juvenile detainees had a duty to obey Appellant as their prison guard. Similarly, the prisoner status of the detainees and Appellant's role in controlling them imparted a duty for them to obey Appellant.

---

[8] The Government did not introduce the Geneva Conventions into evidence at trial, nor did it brief or argue its view as to whether, how, and if the Third or Fourth Geneva Convention applied in the context of Abu Ghraib at the time of Appellant's conduct. Therefore, we cite the Geneva Conventions for the proposition only that as a general matter detainees are obliged to follow the lawful orders of their captors and not as a basis for finding legal sufficiency. See, e.g., Geneva Convention Relative to the Treatment of Prisoners of War art. 82, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 (Third Geneva Convention) (appearing to include within its parameters a confined person's duty to follow orders); Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (Fourth Geneva Convention).

CONCLUSION

The decision of the United States Army Court of Criminal Appeals is affirmed.

EFFRON, Chief Judge (concurring in part and in the result):

I agree with the principal opinion that the military judge did not err with respect to Issue I because the claimed order was not issued by a competent authority. See United States v. Smith, __ M.J. __ (10-12) (C.A.A.F. 2010). I also agree with the treatment of Issues II and III. With respect to Issue I, I write separately to identify several additional considerations regarding the reasons for rejecting Appellant's position.

First, Appellant raises claims now that he did not make at trial. The record contains no instructions proposed by the Appellant. Appellant did not object to the military judge's instructions as given.

Second, in the assigned issue, Appellant contends that the military judge erred in not providing an instruction on the lawful orders defense. Under the lawful orders defense, an act "done in the proper performance of a legal duty is justified and not unlawful." Rule for Courts-Martial (R.C.M.) 916(c); see R.C.M. 916(d) Discussion (referring to R.C.M. 916(c) as providing the defense with respect to an act done pursuant to a lawful order). In contrast to the defense of obedience to orders under R.C.M. 916(d) and United States v. Calley, 22 C.M.A. 534, 48 C.M.R. 19 (1973), the lawful orders defense does not entail consideration of whether an accused reasonably believed that an order was lawful. Compare R.C.M. 916(c) and

R.C.M. 916(d); see also Dep't of the Army, Pam. 27-9, Legal Services, Military Judges' Benchbook ch. 5, § 8, para. 5-8-2 (2002) (setting forth the instruction applicable to R.C.M. 916(c)). The beliefs of an accused, even if reasonable, cannot transform an unlawful order into a lawful order under R.C.M. 916(c). As noted in the principal opinion, the record in this case establishes that the orders Appellant claimed to receive -- to use his military working dog in aid of interrogation -- were not issued by a competent authority. __ M.J. at __ (10-12). As such, the orders were not lawful, and the military judge had no duty to instruct as to obedience to lawful orders. See id.

Third, the military judge properly determined that for the specifications related to Appellant's use of a military working dog on Mr. Al-Juhayshi, "The evidence has raised an issue of obedience to orders . . . ." The military judge then instructed the members, consistent with R.C.M. 916(d) and our decision in Calley, 22 C.M.A. at 541-43, 48 C.M.R. at 26-28, regarding the defense of obedience to orders. The instruction given by the military judge enabled the members to evaluate whether Appellant "knew the orders to be unlawful or a person of ordinary sense and understanding would have known the orders to be unlawful." R.C.M. 916(d). In a particular case, there may be significance under R.C.M. 916(d) to the distinction between an order that is unlawful because of an administrative defect, as in this case,

and an order that is unlawful because it commands the commission of a crime, as in Calley.  In the present case, however, Appellant has not contended that the military judge should have given additional instructions in that regard.  Under the circumstances of this case, the military judge did not err with respect to the manner in which he instructed the members under R.C.M. 916(d).